**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Anthony CATALFO, Defendant–Appellant.**

**No. 94–2562.**

United States Court of Appeals, Seventh Circuit.

Argued March 27, 1995.

Decided Aug. 30, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied Nov. 16, 1995.

Barry Rand Elden, Asst. U.S. Atty. and Charles Ex (argued), Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Michael D. Monico, Barry A. Spevack, Monico, Pavich & Spevack, Chicago, IL, and Peter Goldberger (argued), and Alan Ellis, Ardmore, PA, for defendant-appellant.

Before FLAUM and MANION, Circuit Judges, and SHARP,* District Judge.

FLAUM, Circuit Judge.

Defendant Anthony Catalfo was convicted on six counts of wire fraud under 18 U.S.C. § 1343 for his trading activities at the Chicago Board of Trade on October 22, 1992, and sentenced to 42 months imprisonment. On appeal, Catalfo challenges both his conviction and sentence. We affirm.

## I.

In 1992, Anthony Catalfo came to Chicago to learn about the options market. He enrolled at the International Trading Institute ("ITI") in April, entering their "Lab Tech" program, which allowed students to attend classes on basic options trading tuition free in exchange for six months of work.

At ITI, Catalfo met Donald Zimmerman, who taught classes there and traded on his own. Zimmerman soon became Catalfo's mentor and friend, the two of them often socializing and working together during the summer of 1992. In June, Catalfo and an-

other student, Mark Mason, pooled $30,000 of their own money and agreed to have Zimmerman trade with it at the Chicago Board of Trade ("CBOT"). Zimmerman leased a Commodity Option membership at the CBOT so he could trade with the funds, while Catalfo functioned as Zimmerman's clerk and watched him work. Zimmerman tripled the $30,000.

Also during the summer, according to the government, Catalfo and Zimmerman developed a strategy to make their fortune in U.S. Treasury bond futures and options. A future is a contract for the sale of a specified quantity of a commodity, in this case Treasury bonds, at a given date. A person buying a futures contract believes the market will rise, while a person selling futures believes it will decline. An option, on the other hand, is a contract for the sale of an underlying futures contract at a set price at a given date. Options are either puts or calls. A put is an option to sell the contract at a set price, known as the "strike" price, before a given date. A call is an option to buy the contract at a given price before a given date. A person who purchases puts or sells calls generally believes the market will decline or is hedging against such a decline. Conversely, a person who purchases calls or sells puts believes the market will rise.

Catalfo and Zimmerman's plan focused on the purchase of Treasury bond puts and sale of Treasury bond futures contracts in massive quantities. They reasoned, in line with elementary principles of mass psychology, that such large-scale investment in a downward-looking position would cause other traders to think the market was going down and to act accordingly. With everyone believing the market would decline, it would, thus making their initial positions increasingly valuable. Before other traders realized what had happened, Catalfo and Zimmerman planned to exit the market by purchasing offsetting calls and collecting their profits.

Commodity traders often hedge their market speculations by executing offsetting

* The Honorable Allen Sharp, Chief Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

trades going in the opposite market direction, thereby reducing their potential profits but also their risks. For example, a person purchasing bond futures contracts might offset those purchases with positions that envision a market decline, such as a sale of call options or a purchase of put options. What Catalfo and Zimmerman planned to execute is known as a "Texas hedge." In a Texas hedge, all one's market positions anticipate the market moving in the same direction—such as the purchase of put options and sale of bond futures. A Texas hedge is thus really no hedge at all.[1]

In addition to talking about such trading strategies, Catalfo apparently made a dry run of such a scheme while at ITI. ITI uses as a teaching tool a simulator called Trade$tar. Trade$tar is a computerized, interactive voice-activated simulator for trading futures and options. One day, about three weeks after Catalfo started at ITI, Catalfo was discovered making huge trades on the Trade$tar by purchasing thousands of puts and selling thousands of shares of the stock underlying the puts—a Texas hedge. An ITI instructor warned Catalfo that if he traded in real life the way he was trading on the simulator, he would be "taken away either in handcuffs or on a stretcher."

In order to trade on the floor of the CBOT, a trader needs a clearing firm. Clearing firms are members of the CBOT and guarantee their customers' trades on the basis of security put up by the customer. Zimmerman, who had had a history of trouble with clearing firms, had executed his trades with Mason and Catalfo's money through the Transmarket Group clearing firm. At the end of July, however, Transmarket asked Zimmerman to leave. On July 30, 1992, Zimmerman contacted the clearing firm of Lee B. Stern & Co. to trade there. Zimmerman talked to Stern's general manager, Marvin Parsoff, and was able to secure a position there with a series of misrepresentations. Zimmerman told Parsoff that he had left Transmarket because they were cutting back on options traders (he had been asked to

leave because of his trading habits) and that he had a net worth of $100,000 (he had negative bank account balances). Zimmerman also promised that he was a small trader who would keep his market positions "delta neutral," meaning that the positions would offset one another and be risk free. Parsoff agreed to clear Zimmerman's trades, and Zimmerman transferred his Transmarket account—$40,000 in bond and soybean option positions with offsetting futures—to Stern.

Soon after the transfer, Parsoff learned that Zimmerman still had an outstanding debit balance with another trading firm as a consequence of trading losses totaling nearly $75,000. Parsoff also discovered that Zimmerman had stopped making payments on the debt a few months earlier. Parsoff responded by telling Zimmerman that he wanted Zimmerman's account moved out of Stern and that Zimmerman should cease trading. Zimmerman replied that he was leaving for Germany and asked Parsoff if he could leave the account open until he returned. Parsoff agreed but restricted the account to a "liquidation only" trading parameter, meaning that Zimmerman could only trade out of the positions he had already placed or make small adjustments to keep them delta neutral. While Zimmerman was in Germany, Catalfo and Mason controlled the account and liquidated it down to the point where all that remained was $500 in risk-free bean options.

Also at the end of July, Catalfo applied for a full membership at the CBOT so that he could trade there. He contacted the clearing firm of Goldenberg, Hehmeyer & Co. ("GH"), and asked if they would sponsor his application and become his clearing firm. Catalfo first met with Ralph Goldenberg, one of the principals of GH, who discussed with him the credit limits GH extended to its customers: three times the net liquidating value of his account up to a maximum of $150,000. Catalfo apparently understood this, or at least never indicated that he did not. Catalfo later met with Chris Hehmeyer, GH's other principal, and told Hehmeyer that he intend-

---

1. Such a strategy is also referred to by traders as an "O'Hare spread"; "[t]he idea is to bet on an insanely large position and head to the airport. If at the end of the day the position makes money, you head to Hawaii; if it loses, it's off to South America." Ted C. Fishman, ... *Almost, Worth* 72 (December/January 1994).

ed to trade in offsetting contracts with very small price differentials between them, a practice known as "scalping." Scalping offers a low rate of return but also involves comparably little risk. Goldenberg and Hehmeyer agreed to sponsor him and to let him use GH as his clearing firm.

In the course of doing a routine background check on his CBOT membership application, CBOT's Membership Services Department discovered that Catalfo had an unpaid student loan owed to New York State and that a judgment had been entered against him for that debt. The CBOT application requires the disclosure of all unpaid debts and judgments, and Catalfo had not mentioned the student loan. On detecting the discrepancy, the CBOT held Catalfo's application in abeyance pending resolution of the problem. Catalfo then contacted the New York student loan center, which responded by sending him a telefacsimile indicating that the debt had been paid in full on August 5, 1992. Catalfo, in turn, submitted the facsimile to the CBOT, which accepted the explanation and continued processing his application.

On October 13, 1992, Catalfo met with Hehmeyer to fill out a customer agreement form and other trading documents with GH. Catalfo indicated on the form that he had a net worth of between $50,000 and $100,000, risk capital of $80,000 available,[2] and that no other person had a financial interest in his account. The form also contained a question concerning the customer's limit of margin exposure, which Catalfo left unanswered. Hehmeyer indicated at trial that "[t]he question about margin I don't necessarily have to have from an individual because it is not a hedging operation and it is not a margin call where we would have to be calling a business and getting margins sent in by wire." Goldenberg likewise noted in his testimony that the question did not worry him "because we felt we would have tight control as to what his positions would be and what exposure he would have" and that his discussions with Catalfo had led him to that conclusion. Catalfo similarly reaffirmed his scalping intentions to Hehmeyer while signing the form.

The customer agreement otherwise required Catalfo to "affirm[ ] that he is able to assume the financial risks of commodity futures trading" and that he "will at all times maintain collateral and margin for all accounts as from time to time may be required by" GH in its "sole discretion."

In the interim, Catalfo and Zimmerman began laying ground work for their eventual trades. The two let it be known that they planned on trading in large amounts, and Zimmerman indicated to one bond futures broker, Larry Israel, that he had financial backing from a wealthy Canadian source. Zimmerman additionally asked Israel a number of "hypothetical questions" about making large bond futures trades. Zimmerman and Catalfo also spoke with Terry Mulville, a bond options broker, telling him that they were planning to trade options in large quantities and asking him whether, if he were to serve as their broker, he could handle such orders.

Catalfo and Zimmerman picked October 22 as the day for their big trade. On that day, the Labor Department was to release its latest unemployment figures at 7:30 am Chicago time. Catalfo reasoned that the numbers would show an overall improvement in the employment picture because of the impending election; he thought the administration would try to make things look better than they were and then correct the numbers after the first Tuesday in November. Such a positive unemployment figure would, however, drive down Treasury bond futures and options—thereby improving their market position.

On the evening of October 21, 1992, Dan Himmel, a friend of Catalfo, and Catalfo's brother Larry, arrived from New York. Catalfo and Zimmerman described what they were planning to do the next day, calling it a Texas hedge, and how much money they were going to make, and invited the two to join them on the trading floor the next day. Catalfo specifically indicated to the visitors that he and Zimmerman planned to split their profits in the event one lost and the other made money. Catalfo also told Him-

2. In reality, Catalfo had about $55,000 in his bank account at this time.

mel that they were not going to "give up the house" when they traded, meaning that the persons they sold to would not know that Catalfo and Zimmerman were on the other side of the trade. The last bit troubled Himmel, but Catalfo assured him that it was legal, although only "border-line ethical and you wouldn't do that to somebody who you are going to do business with in the future." Additionally, Catalfo told Himmel that he only had $30,000 in his account and Zimmerman only $600, or perhaps a $600 deficit.

The next morning, Zimmerman and Catalfo arrived at the CBOT accompanied by Himmel and Larry. Zimmerman deposited a worthless check for $50,000 in his account at Stern. At about 7:15, Catalfo and Zimmerman approached Mulville and they gave him a verbal order to purchase 6,000 bond option puts, the order to be executed before 7:30. Zimmerman then left and went to conduct further business, at which point Mulville realized that the huge trades were for Catalfo only.

The Treasury bond option pit opened at 7:20. Between 7:20 and 7:29, Mulville purchased 4,112 put options on Catalfo's behalf, options with a premium cost of $2.1 million. At 7:30, the Department of Labor released its monthly unemployment statistics, and the results were, as Catalfo predicted, optimistic. Bond futures prices had begun to plummet at 7:29, and they continued to fall in the wake of the news. Catalfo then had Mulville sell his positions, and by 7:40, Catalfo was "flat" in the market, having made a profit in excess of $1 million. Catalfo then moved to the bond pit and bought 100 futures contracts.

Also beginning at 7:20, Zimmerman placed orders for the purchase of 24,000 puts on the other end of the pit, options with an associated premium cost of $14.6 million. Zimmerman also sold, through Israel, 12,500 bond futures contracts in the bond pit, the bonds having a face value of almost $1.2 billion, of which he bought back only 800.[3]

At about 8:00 a.m., everything began to unravel. A representative of the CBOT Office of Investigation approached Catalfo and

asked him about his brother and Himmel. Catalfo initially denied any relation to the two men but conceded after some additional questioning that one of the two was his brother. After learning that Catalfo had purchased 100 bond futures contracts and hearing rumors of his massive trading, Goldenberg and Hehmeyer summoned Catalfo from the trading floor. After examining his trading, they asked him whether he knew Zimmerman and if they had talked. Catalfo gave affirmative answers but was not particularly responsive. Hehmeyer asked Catalfo, "Do you want me to call the U.S. Attorney's Office?". Catalfo replied, "I am not answering any more questions." Hehmeyer accused Catalfo of a "breach of trust" and Catalfo left the office. Hehmeyer then directed that Catalfo's 100 futures contracts be sold and his trading privileges be revoked.

Meanwhile, the same representative who had spoken with Catalfo also questioned Zimmerman. Zimmerman asserted that Himmel and Larry Catalfo were his backers and that he would be splitting his trading profits with them. Zimmerman, Himmel, and Larry Catalfo were then escorted from the CBOT floor to Stern's office. Parsoff confronted Zimmerman, who again said that the two men were his backers, fund managers from New York who had "family money." Parsoff demanded $10 million from Zimmerman to cover the trades, to which Zimmerman responded by saying, "We'll just make the call," picked up the receiver and handed it to Himmel. Himmel dialed a number (his sister in New York) and then hung up before the call was completed. The other two left but Zimmerman remained with Parsoff in the office, making two calls to Catalfo's apartment, the first at 9:28, which lasted 52 seconds, and the second at 10:40, which lasted 6 minutes and 54 seconds.

With Zimmerman off the floor, Parsoff and other Stern employees tried to piece together what Zimmerman had been doing and then frantically began liquidating Zimmerman's positions. Other traders, who had watched the massive purchases earlier, realized what

---

3. Unlike Catalfo, who had full membership trading privileges, Zimmerman was not authorized to trade in the bond pit unless he was hedging options trades, something he clearly was not doing.

was happening and moved in for the kill. By the time Stern had disentangled itself from Zimmerman's trades, it had lost $8.5 million, $2 million more than the company's net worth. In one morning of trading, Zimmerman had destroyed an entire clearing firm.

Later that same day, at about 11:30 a.m., Catalfo withdrew approximately $16,500 from his bank account. Around noon, Catalfo met Zimmerman and gave him $1,000 cash. Catalfo, his brother, and Himmel flew back to New York that evening. The next day, Catalfo twice called GH from New York. In the first call, Catalfo requested that his trading profit be sent to him in New York. GH told him that his account was frozen. Shortly thereafter, Catalfo called again to ask about how much money he had in the account. These calls to GH came after Catalfo had spoken with Zimmerman twice.

On July 21, 1993, Catalfo and Zimmerman were charged in a six count indictment with engaging in a scheme to defraud and to obtain money and property by and through fraudulent means in violation of 18 U.S.C. § 1343. Catalfo pled innocent and defended the charges at trial, while Zimmerman fled to Canada. Following a ten-day trial, a jury convicted Catalfo on all six counts, and he was sentenced to forty-two months imprisonment.

## II.

Catalfo raises a number of issues relating to his conviction. First, he asserts that his scheme to defraud was not one cognizable under the wire fraud statute and that his alleged uses of the interstate wires were unrelated to that scheme. Second, he contends that the court improperly instructed the jury that it could convict him of fraud simply for imposing a substantial risk of loss on another without actually finding that he intended to defraud anyone. Third, Catalfo argues that certain improprieties in the government's closing arguments rendered his

trial unfair. Finally, he alleges that the trial court erroneously excluded certain evidence he had sought to introduce regarding his mother's wealth and Zimmerman's intentions.

### A.

█ Catalfo argues that his conviction should be reversed as a matter of law because his trading activities simply did not constitute federal wire fraud as delineated in 18 U.S.C. § 1343.[4] He asserts that he did not defraud anyone of any tangible property and that his uses of the wires had no real connection to his alleged fraud. On both points, Catalfo essentially is challenging the sufficiency of the evidence against him. We review such challenges solely to determine whether a reasonable jury could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979); *United States v. Theodosopoulos*, 48 F.3d 1438, 1449 (7th Cir.1995).

█ Although Catalfo tried to make his money on the floor of the CBOT, the government did not seek to prove that his trading in and of itself constituted fraud. Rather, the government argued, Catalfo engaged in a scheme to defraud his clearing firm (and Zimmerman's) by subjecting the firms to the substantial risks their trading created. Catalfo did this by encouraging GH to believe that he intended to trade small and then using its backing to engineer his massive scheme.

Catalfo replies that he did not seek to profit from GH but rather on the floor of the exchange and that that difference places him beyond the reach of the wire fraud statute. He compares his case to *United States v. Walters*, 997 F.2d 1219 (7th Cir.1993), in which we reversed the conviction of Norby Walters, an entertainment agent who had tried to secure the business of 58 college athletes still enrolled in school by giving

4. Section 1343 provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits, or causes to be transmitted by means of wire ... in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme, or artifice shall be fined under this title or imprisoned not more than five years, or both....

them money and other valuables in exchange for exclusive agency contracts with him. The government charged Walters with fraud on the grounds that he had caused several universities to pay scholarship funds to athletes who had become ineligible as a result of the contracts, and we refused to consider that activity mail fraud. We noted that Walters had intended to profit only from legitimate market transactions and that his scheme only inflicted a loss on the universities as a tangential by-product. *Id.* at 1227. Although he violated several collegiate athletic rules, Walters did not attempt to take money from the colleges or athletes illegally. Catalfo contends that he, like Walters, wanted to make money legally—in this case on the floor of the CBOT through proper transactions at the expense of other traders. Catalfo never directed false statements at those other traders; regardless of whether his trading was "borderline ethical" and whether he might have violated portions of the Commodity Exchange Act, *see* 7 U.S.C. §§ 6(a), 13, the indictment does not thus charge him.

We conclude Catalfo's activities fit within § 1343's prohibitions. Unlike Walters, whose profits were to be derived from his legitimate contracts, Catalfo sought his profit-based on collateral fraudulently obtained from someone else. "[J]ust as it is embezzlement if an employee takes money from his employer and replaces it before it is missed, ... so it is fraud to impose an enormous risk of loss on one's employer through deliberate misrepresentation even if the risk does not materialize." *United States v. Dial*, 757 F.2d 163, 170 (7th Cir.), *cert. denied*, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985); *see also United States v. Sanders*, 893 F.2d 133, 138 (7th Cir.), *cert. denied*, 496 U.S. 907, 110 S.Ct. 2591, 110 L.Ed.2d 272 (1990); *United States v. Cosentino*, 869 F.2d 301, 307 (7th Cir.) (noting that the fraudulent deprivation of another's money is "no less a fraud because it was part of a scheme that might have generated a profit") *cert. denied*, 492 U.S. 908, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989). In essence, Catalfo is not too much

different from a clerk who "borrows" money out of the register to place a bet on a "sure thing" at the track. Catalfo just operated with a deeper till and wagered at a more sophisticated course.

Catalfo, relying on the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), additionally maintains that § 1343 does not embrace attempts to defraud someone of intangible rights. In *McNally*, the Court reversed a conviction where the prosecution sought to base a § 1341 case on the charge that the defendants had defrauded "the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly." *Id.* at 353–54, 107 S.Ct. at 2878.[5] Catalfo asserts that even assuming he and Zimmerman deceived their clearing firms into providing them additional backing, this deception only violated an intangible right of honest dealing from its clients. Following *McNally*, however, the Court subsequently held in *Carpenter v. United States*, 484 U.S. 19, 25, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987) that the statutes cover schemes to deprive someone of intangible property. *See also United States v. Cherif*, 943 F.2d 692, 697 (7th Cir.1991), *cert. denied*, 503 U.S. 961, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992). Unlike the *McNally* defendants, Catalfo defrauded GH of the right to control its risks. By means of deception, he caused GH to back his trading scheme, knowing that any loss would fall on its shoulders, not his own. The government did not allege or seek to prove that Catalfo deprived GH of any right to honest customers. Rather, he deprived GH of the right to control its risk of loss, which had a real and substantial value.

Catalfo next argues that he did not have a fiduciary relationship with GH that required him to divulge everything and respect its trading limits, thus distinguishing his case from *Dial* and *United States v. Ashman*, 979 F.2d 469 (7th Cir.1992), *cert. denied*, — U.S. ——, 114 S.Ct. 62, 126 L.Ed.2d 32 (1993), in

---

5. Congress overruled *McNally* on this precise point by enacting 18 U.S.C. § 1346, which provides "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." *See United States v. Bush*, 888 F.2d 1145 (7th Cir. 1989).

which brokers defrauded their clients of money. He points out that he had no margin limit placed on him and that nothing in the written agreement he signed with GH, an agreement that purports to integrate all promises made from one party to the other, prevented him from trading beyond his limited capital outlay. We disagree. Regardless of whether GH (and Stern) ought to have been more cautious in choosing its customers, trial evidence amply demonstrated that Catalfo lulled GH into believing he would trade at a small level, indicated that he only had assets to trade at a small level, and then traded as if he had huge capital resources by using his clearing firm's backing. Fraud remains fraud even if the victim should have acted more prudently.

Taking a slightly different tack, Catalfo asserts that the wire transmissions of which he is accused of causing to be made were not sufficiently "for the purpose of executing the scheme" as required by § 1343. The charged wire transmissions fall into three groups. Count One involved the New York State Higher Education Services Corporation's telefacsimile to Catalfo confirming that his student loans had been paid. Counts Two through Four concerned the numerous wire transmissions made by Dow Jones and other information services during Catalfo and Zimmerman's October 22 trading ventures. Finally, Counts Five and Six related to telephone calls Catalfo made on October 23 to GH and to Zimmerman. We address each group in turn.

■ First, the CBOT had informed Catalfo that they had put his membership on hold because of an unpaid student loan. Catalfo contacted the student loan center to explain the alleged delinquency, and they responded by sending him a telefacsimile from New York to Chicago. The facsimile clearly traveled over interstate wires. Catalfo says that no evidence showed he intended that transmission to go over interstate wires or that he foresaw a facsimile transmission as opposed to the use of the mails or private overnight carrier.[6] We only require, however, that a defendant act with the knowledge

that such a transmission is a reasonably foreseeable event attendant to his actions. *United ed States v. Brandon*, 50 F.3d 464, 467 (7th Cir.1995). Catalfo asked the student loan center to send him information in Chicago so that he could receive his CBOT membership and execute his trades; without the fax, Catalfo would not have been able to trade. Catalfo asserts that we have slid down the slippery slope to such an extent that any action might seem to depend on some wire transmission. *See Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1252 (7th Cir.1989). That simply is not the case here.

■ Second, Catalfo and Zimmerman's trading scheme depended on others panicking as a consequence of their massive options and futures trading. Both Himmel's testimony and the evidence of Catalfo's activities on the Trade$tar program showed that Catalfo was well aware of this predictable consequence. Given this evidence, a jury could reasonably conclude that Catalfo knew that futures and options price information would be disseminated over interstate wires like those used by Dow Jones, Quotron, and Reuters and that his profit from his placing a risk on GH (and Sterns) depended on these interstate communications. *Cf. Cherif*, 943 F.2d at 696.

■ Third, Catalfo made two telephone calls to GH on October 23, the first asking for his money and the second confirming the amount of money in his trading account. Catalfo denies that these calls furthered the scheme because the scheme had ended when GH and the CBOT froze his account. We have held, however, that conversations occurring after the end of trading regarding the profitability of the trades could be in furtherance of an illegal scheme. *Sanders*, 893 F.2d at 138–39. Catalfo suggests that *Sanders* has little reasoning behind it and is in any event distinguishable because the traders there had not yet completed their fraud and ended their scheme, whereas here Catalfo's scheme had already collapsed at the time of these calls. Putting aside the suggestion to overrule *Sanders*, we believe that a jury

---

**6.** Had he received the information through the mail, the only difference in our discussion would likely be our attention to § 1341 instead of § 1343.

could have understood Catalfo's calls as attempts to ascertain and collect the proceeds of the scheme and an important part of the plan. This is especially true in light of Catalfo's three telephone conversations with Zimmerman and his admission at trial that he still thought after he left the GH office that he would be able to collect the proceeds from his options trading.[7]

## B.

Catalfo also argues that a jury instruction rendered his trial unfair. The indictment, following the language of § 1343, required a finding that he "knowingly intended to defraud another person." In instructing the jury, the court stated that this intent was a necessary element of the crime. A few paragraphs later, the court defined "intent to defraud" and then reiterated the intent requirement with a slight amendment:

> The phrase "intent to defraud" means that the acts charged were done knowingly with the intent to deceive a potential victim, in order to cause the loss of money or property to the potential victim, or to cause a financial gain to the defendant.

> The wire fraud statute required proof that a defendant knowingly intended to defraud another person. However, the statute can be violated when an enormous risk of loss is placed on another person even though that person does not actually suffer an economic loss.

When the government proposed this elaboration, Catalfo objected, arguing that the phrasing in the second paragraph causes the second sentence to "defeat" the first by suggesting that imposing a large risk of loss of another will satisfy the government's burden of proof even where the defendant had no intent to defraud. The court disagreed with Catalfo's suggestion, replying, "I think that's right. I think that's what the law is in this Circuit. That's pretty clearly the law.... I think the instruction states what the situation is. I think the instruction is correct, sir."

In reviewing this issue, we note that appellate courts do not sit to deconstruct jury instructions. Whether a jury has been properly instructed "is to be determined not upon consideration of a single paragraph, sentence, phrase or word, but upon the charge as a whole." *United States v. Alexander*, 743 F.2d 472, 478 (7th Cir.1984) (*quoting United States v. Lang*, 644 F.2d 1232, 1240 (7th Cir.) (as modified), *cert. denied*, 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981)). Although an inartful sentence can spoil a whole instruction, that is the exception rather than the rule.

The alleged confusion on this issue derives from the implications of our decisions in *Dial, Cosentino,* and *Sanders.* In those cases, we observed that the intent to impose a large risk on another person through deliberate misrepresentation could constitute the requisite intent to sustain a conviction under mail and wire fraud statutes. *Sanders*, 893 F.2d at 138; *Cosentino*, 869 F.2d at 307; *Dial*, 757 F.2d at 170. It is true, as Catalfo argues, that a defendant's imposition of risk on another person does not necessarily mean that the defendant had the intent to defraud the other person; that factual scenario merely provides a reasonable juror a way, albeit a rather convincing way, to infer the intent. The challenged instruction states nothing more: "However, the statute *can* be violated when an enormous risk of loss is placed on another person even though that person does not actually suffer an economic loss."

Catalfo asserts that the use of the word "However" transformed that sentence from an explanation of what might underlie intent to a replacement of the previous definition, or at least rendered the sentence ambiguous. We disagree. "However" served merely as a connector. A speaker or writer can use "however" to create an alternative to the preceding thought, and if the disputed paragraph stood alone as the only reference in

---

7. Catalfo also argues that even if his call in Count Five, when he asked for his money, could be considered a part of the scheme, the follow-up call in Count Six, when he inquired how much money he had in his account, could not, since he then knew he could not lay his hands on the funds. Again, Catalfo's call may have been mere curiosity, but a jury reasonably could have concluded otherwise.

the jury instructions to intent, we might be more receptive to Catalfo's contentions of ambiguity. But in the context of this case, where the court had repeatedly declared "intent" to be a necessary element of the case and made no inaccurate statement of law, no reasonable juror could have been misled regarding the necessary finding of intent. *Brandon,* 50 F.3d at 468 (7th Cir.1995).

### C.

Catalfo next contends that the government committed reversible error in its rebuttal closing argument by calling Catalfo a liar, appealing to the jury members to view themselves as "victims" of Catalfo's lies, and improperly vouching for government witnesses.[8] Catalfo also claims that these remarks went beyond the proper scope of any rebuttal. Catalfo did not object to closing argument at trial, making our review for plain error only. FED.R.CRIM.PRO. 52(b); *United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993).

■ The government's arguments were not improper. Where the character and credibility of the defendant are at issue and the evidence allows the inference that the defendant has been less than truthful, the prosecutor does not err in closing argument by referring to the defendant as a liar. *See United States v. Goodapple,* 958 F.2d 1402, 1409–10 (7th Cir.1992); *United States v. Spivey,* 859 F.2d 461, 465–66 (7th Cir.1988); *United States v. Holt,* 817 F.2d 1264, 1275–76 (7th Cir.1987); *United States v. Chaimson,* 760 F.2d 798, 811 (7th Cir.1985); *see also United States v. Dean,* 55 F.3d 640, 665 (D.C.Cir.1995). The prosecutor can go too far if her references to the defendant's veracity are intemperate and excessive, *Chaimson,* 760 F.2d at 811, but that is not the case here. Moreover, the rebuttal itself made up a comparably small portion of the government's

closing arguments—the government's explanation of its entire fraud case was much lengthier. Indeed, the extent of the government's remarks here (four references to Catalfo as a liar in fifty pages of closing arguments) was similar to that considered acceptable in *Chaimson,* where we held that three references to the defendant as a liar in the space of a forty-eight page closing argument did not cross the line of prosecutorial misconduct, *see id.; see also United States v. Jungles,* 903 F.2d 468, 479 (7th Cir.1990) (three references to defendant as a liar in closing argument deemed not to be improper). Furthermore, the *Chaimson* defendant had objected to the government's remarks below, whereas Catalfo did not; there was no plain error here. *See also Jungles,* 903 F.2d at 479 (holding that, even though review was for plain error, government's references were proper).

■ The same can be said of the government's lone veiled invitation to the jury to consider itself another victim of Catalfo's fraud and its comments on the credibility of government witnesses. Comments on the credibility of witnesses are permissible so long as the comments are based on proper inferences gleaned from the evidence at trial. *United States v. Patterson,* 23 F.3d 1239, 1250–51 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 527, 130 L.Ed.2d 431 (1994); *Goodapple,* 958 F.2d at 1409–10. After Catalfo related a version of events that conflicted with the testimony of Himmel and other government witnesses, the prosecutor legitimately could argue that the jury should believe one and not the other, so long as he did not personally vouch for the honesty of the witness on whom he was relying, which he did not do. Inviting the jury to consider itself a victim, while perhaps itself an unfortunate intimation, did not render an otherwise fair trial unfair, certainly not plainly so,

---

8. The government attorney began his rebuttal as follows:

What's so hard about telling the truth to somebody. That's what this case is all about. That's what we should expect from every witness on that stand.

Mr. Catalfo was distrustful of the Government at this point, and that's why he was acting the way he did on the stand.

All he did was get up there and lie to you time and again, because that's what's important to him to make you the latest of his victims, to make sure you also believe his lies. In the whole of his argument, which extends over less than ten pages of a trial transcript in excess of 1500 pages (compared to forty pages for the government's initial closing argument), the government referred to Catalfo as a liar four times.

as our standard of review requires. Moreover, we ordinarily presume that the court corrected any error, of which there was none, by instructing the jury as it did that "[o]pening statements, closing arguments and other statements of counsel should be disregarded to the extent they are not supported by the evidence." *See Rodriguez v. Peters,* 63 F.3d 546, 559 (7th Cir.1995).

 Finally, the government did not inappropriately use rebuttal to raise new arguments to which Catalfo could not respond. Catalfo's attorney asserted in his closing that the jury should believe Catalfo and discredit the words of most of the government witnesses; the government's rebuttal simply and understandably countered that argument.

## D.

 Catalfo also asserts that the district court erred in excluding certain evidence on grounds of relevancy. *See* FED.R.EVID. 401. At trial Catalfo sought to introduce documents that would show that Zimmerman had been forced by a previous clearing house to get therapy and asked to leave another clearing house that thought him a danger to clearing firms and the exchange. This evidence, Catalfo argues, would have shown that Zimmerman was capable of excessive trading on his own and that he did not need Catalfo to develop a scheme to defraud a clearing firm. Catalfo also tried to introduce the testimony of his mother, who would have stated that she was very rich and would have given him any money needed to cover any losses. This proof, Catalfo asserts, would have shown that he never intended to defraud the clearing firm. We review the exclusion of evidence for abuse of discretion. *Jackson v. Bunge Corp.,* 40 F.3d 239, 246 (7th Cir.1994).[9] Error may not be predicated upon a ruling which excludes evidence unless the exclusion affects a substantial right of the party affected. FED.R.EVID. 103(a).

 Neither contention has merit. First, testimony on both points was elicited during direct and cross examination. Government witnesses testified about Catalfo's mother's wealth and support of her son, while Catalfo stated on cross-examination that Zimmerman "needed to go to psychotherapy, you know, that he blew out of different places, things of that nature I now know, that he blew out—like five or six other clearing firms." To that extent, jurors had these issues before them. Second, neither line of inquiry was relevant. Catalfo did not reach the conclusion that Zimmerman was an unstable person until after October 22. All that evidence about Zimmerman could show is that Zimmerman could have acted on his own; it would not tend to prove that Zimmerman was less likely to have a co-conspirator. With regard to Catalfo's mother, she had no legal obligation to repay GH for any losses and Catalfo had never told GH that she would provide collateral for any losses—a clearing firm would have had no right to rely on that promise; indeed, it would likely have been unreasonable for it to do so.

Catalfo also argues that he suffered because even though he was able to mention these defenses in his own testimony, he was not able to corroborate that testimony. Thus, he argues, he was allowed to argue points and then not back them up; the jury heard Catalfo say that his mother would support him and then his mother did not even testify on his behalf. Catalfo contends that our decision in *United States v. Peak,* 856 F.2d 825 (7th Cir.), *cert. denied,* 488 U.S. 969, 109 S.Ct. 499, 102 L.Ed.2d 535 (1988), compels the grant of a new trial on these points. In *Peak,* the court had permitted one defendant to testify only to his side of a conversation with a co-defendant in which the first defendant had proposed a scheme to capture an individual. What the jury did not learn, because of the improper exclusion of the other side of the story as hearsay testimony, was the second defendant's response that "this was the craziest idea he had ever heard." *Id.* at 833. This testimony would have provided the sole and best evidence

---

9. The government also argues that any error in this regard was harmless under FED.R.CRIM.PRO. 52(a). Because we can discover no impropriety in the district court's ruling, we do not reach the question of harmless error.

negating the second defendant's intent; "Without it, he had little chance of acquittal; with it, he could have placed some doubt in jurors' minds as to his intent." *Id.* at 835. Catalfo's protestations to the contrary, little similarities exist between the situation in this case and that in *Peak.*[10]

## III.

Finally, Catalfo argues that the district court improperly enhanced his sentence under U.S.S.G. § 2F1.1(b)(1)(O) by holding him accountable for the $7 million loss suffered by Stern. Catalfo contends that his activities caused nobody any loss and that Zimmerman alone should be held accountable for what he wrought. Catalfo admits that he and Zimmerman had planned to split their winnings but denies that he could have reasonably foreseen Zimmerman's intergalactic levels of trading in furtherance of their conspiracy as is required under U.S.S.G. § 1.B1.3(a)(1)(B).

■ Under U.S.S.G. § 1.B1.3(a)(1)(B), a defendant can be sentenced for his own acts and "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." The district court found that Catalfo conspired with Zimmerman and that Zimmerman's losses were foreseeable. It thus held Catalfo responsible for the $7 million dollar loss Zimmerman's clearing house sustained (equal to Zimmerman's $8.5 million loss less Catalfo's $1.4 million gain). *See* U.S.S.G. § 2F1.1(b). We review the court's findings on the amount of loss for clear error only. *United States v. Dillard,* 43 F.3d 299, 309 (7th Cir.1994).

■ Catalfo asserts that the court made only general findings regarding foreseeability, findings that are inadequate under *United States v. Edwards,* 945 F.2d 1387 (7th Cir.1991), *cert. denied,* 503 U.S. 973, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). In *Edwards,* we stated that district courts should "set[ ] forth the reasons why the particular

amount of [loss] was reasonably foreseeable to [the defendant]." *Id.* at 1399. Precise explanations are obviously preferred because they aid review of sentencing decisions and more fully inform a defendant of the reasons underlying his sentence. *Id.* However, a lack of specific findings does not automatically require a remand for reconsideration. *Compare United States v. Goines,* 988 F.2d 750, 777 (7th Cir.) (remand necessary where court made no specific findings before holding all co-conspirators liable for the amount of cocaine involved in the entire conspiracy), *cert. denied,* —— U.S. ——, ——, ——, 114 S.Ct. 241, 483, 558, 126 L.Ed.2d 195, 433, 458 (1993) *with United States v. James,* 40 F.3d 850, 872 (7th Cir.1994) (court gave no specific reasons for its findings but record adequately supported them), *cert. denied,* —— U.S. ——, ——, 115 S.Ct. 948, 1160, 130 L.Ed.2d 891, 1116 (1995) *and United States v. Mojica,* 984 F.2d 1426, 1445 (7th Cir.) (affirming decision based on generic findings because the defendant presented no evidence substantiating his claim of error), *cert. denied,* —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); *see also Edwards,* 945 F.2d at 1400–03 (affirming some sentences and remanding others, all based on the same boilerplate language).

■ While the court's findings in this case appear very general, they are nonetheless sufficient. In this case, as opposed to the multi-defendant drug conspiracy involved in *Goines,* only one conspiracy existed that Catalfo, as one of only two conspirators, necessarily joined it to its full extent. The only question is whether he could have foreseen Zimmerman's actions. The district court answered this query in the affirmative but without specifying its reasons for doing so. We must therefore inquire whether Catalfo has "offered [a] meritorious argument[ ] for remanding [his] case[ ]." *Edwards,* 945 F.2d at 1400.

**10.** We additionally note that far from harping on the fact that Catalfo's mother did not testify, the government's closing argument emphasized how unimportant her money was: "You see, ladies and gentlemen, when Mr. Catalfo and Mr. Zimmerman walked in to [sic] those pits clearing those firms, it's irrelevant to the brokers ... how much money they have got, how much money their moms have got, how much money their brothers have got. That's irrelevant." Similarly, in rebuttal closing argument, the government stated: "And then he comes in with the—well, my mom has got a lot of dough. What does this have to [sic] with the case? Absolutely nothing."

"Reasonable foreseeability refers to the scope of the agreement" that Catalfo assented to, not the specific transactions he expected Zimmerman to make. *See United States v. Flores*, 5 F.3d 1070, 1083 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 884, 127 L.Ed.2d 79 (1994). Catalfo argues that the only evidence pertaining to the extent of the agreement between himself and Zimmerman indicates that Zimmerman conducted his losing trades on his own initiative after Catalfo had liquidated his position. Thus, Catalfo maintains, he could not have foreseen Zimmerman's losses. *See* Ted C. Fishman, ... *Almost*, WORTH 72 (Dec./Jan.1994) (attached to Catalfo's presentence report). While Zimmerman's acting by himself is a possible reading of the events, it is not the only permissible one. Indeed, trial evidence, as well as the above noted article, showed that Catalfo and Zimmerman plotted for months and discussed making trades thousands of times larger than their past activities. As Zimmerman explained their plan in the article, "We were going to take down the world financial system ..." Carrying out this plan depended the actions of both men. Furthermore, Catalfo and Zimmerman agreed to split their profits in case one of them lost money, and nothing indicates that the men agreed to stop at any certain point. Based on all of this evidence, the district court did not clearly err in finding that Catalfo could have foreseen Zimmerman's conduct and the resulting possible loss.

For the foregoing reasons, Anthony Catalfo's conviction and sentence are affirmed.

AFFIRMED.