In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1632

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHAD VINCENT IACONA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 11-CR-30120-MJR — **Michael J. Reagan**, *Judge.*

ARGUED FEBRUARY 26, 2013 — DECIDED AUGUST 27, 2013

Before EASTERBROOK, *Chief Judge*, and ROVNER and
WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* On December 2, 2011, Chad Vincent
Iacona was convicted of fraud in connection with an access
device and aggravated identity theft, in violation of 18 U.S.C.
§§ 1029(a)(2) and 1028A respectively. Those charges stemmed
from his actions in obtaining a Wells Fargo Visa card using the
identification of another person, Nancy Clymer, without her

authorization, and with the intent to defraud her and her business, D & L Investigations.

Iacona worked as a process server for D & L Investigations ("D&L"), a private investigation service owned by Nancy Clymer. D&L was formed by Clymer and her husband Donald, and Clymer continued to operate it after Donald's death in 1989. The business mainly consisted of providing process service for local attorneys, but also encompassed some surveillance and other investigative work.

In May 2005, Iacona agreed to purchase the business from Clymer. Because Clymer had previously attempted to sell the business only to have the purchasers default within a month, she demanded the implementation of certain protections from Iacona. In the purchase agreement with Iacona, Clymer structured the arrangement so as to retain ownership of the business while Iacona paid $2000 per month for two years toward a total purchase price of $95,000, with a balloon payment of the remaining balance after those two years. During that payment period, Clymer would retain ownership of the business, but Iacona would run the business. The agreement also required Iacona to secure a line of credit in order to pay the recurring monthly expense for an investigative research service. Those terms were later renegotiated when Iacona had difficulty paying, and Clymer ultimately signed over the business to him in early 2008.

The testimony at trial established that Iacona quickly began to establish numerous lines of credit in the name of D&L and in Clymer's name. Almost immediately after the purchase agreement, Iacona obtained from George Weber Chevrolet a

Chevrolet Malibu either in a lease or purchase arrangement (the testimony diverged on that point). The paperwork for that vehicle signed by Iacona listed him as the president of D&L although Clymer was the president at that time, and indicated that he had worked for D&L for 16 years even though at that time he had worked at D&L for only about a month of its 16-year existence. The paperwork represented the gross annual income of D&L as "$500,000 plus," but Clymer testified that in its best year D&L earned only approximately $50,000. When Clymer learned of Iacona's acquisition of the Malibu, and that he had also opened a credit account with Office Depot, she had her attorney send a letter to the dealership and to Office Depot—with a copy to Iacona—informing them that Iacona had no authority to open a line of credit in D&L's name and that he was not the president of D&L.

Iacona nevertheless proceeded to open up numerous other credit cards, which he used to incur significant debt on purchases unrelated to the business, and continued to do so for the ensuing two years. The suspect purchases included multiple charges at Bed, Bath & Beyond, Pet Smart, grocery stores, restaurants, and charges related to a swimming pool and the purchase of a pool table. One of those credit lines, with Capital One, was obtained through an internet application in which Clymer's name, social security number, and date of birth were used. Only one credit card, however, was the focus of the criminal complaint—a Wells Fargo Visa card.

The testimony was undisputed that Rebecca Rasmussen, Iacona's sister who was hired by Iacona as a secretary for D&L, applied for the Wells Fargo Visa by phone and represented herself to be Clymer. Rasmussen used Clymer's social security

number and personal information as well as information about D&L to obtain the Wells Fargo Visa with a credit limit of $50,000, split evenly into a $25,000 account in Clymer's name and a $25,000 account in Iacona's name. Under the terms of the card, Clymer was personally liable for the debts on both accounts. Iacona testified, however, that he was not present when Rasmussen made that call and that she did not do so under his direction. Instead, he asserts that he instructed her to obtain a credit card with the lowest interest rate possible, and that she obtained the Wells Fargo Visa on her own initiative.

The government presented the testimony of Rasmussen that Iacona instructed her to call to obtain that Wells Fargo Visa and that he was present during that call and supplied her with Clymer's personal information in response to the questions during that phone application. The government also played a recording of that call to allow the jury to hear pauses in Rasmussen's answers which she attributed to the delay in obtaining the answers from Iacona.

In addition, the government presented testimony that Iacona maintained control over the credit cards and payment statements. Rasmussen testified that she only opened mail related to the process serving business, and that credit card mail was left in a pile for Iacona to open himself. Postal inspector Matthew Murrow, who had investigated the allegation of identity theft, provided some corroboration for that contention. He testified that when he executed a search warrant at D&L, he observed a large pile of bills, credit card statements, and mail collection notices, some opened and some unopened, on the desk in Iacona's office, and that the stack was 3 or 4 inches high. He further testified that in that stack was a

credit card in Iacona's name as an authorized user on an account in Clymer's name, and that a corresponding card for Clymer on that account was found in the garbage can next to Iacona's desk.

As part of the investigation, Murrow contacted Iacona to question him regarding the lines of credit opened in Clymer's name. Shortly after Murrow spoke with him, Iacona contacted Wells Fargo and attempted to make arrangements to pay off the debt for which Clymer was liable. He also called Clymer and left her a voicemail which she played for Murrow. In that recording, Iacona stated:

> I've got some Postal Inspector calling me … about credit cards under or it has your name on it or something like—account so, uhm, it shouldn't have anything to do with your name. We took out some accounts that were through D & L with the tax ID number so—uhm, I don't know if you know any-thing about that or not, but this guys [sic] calling me —asking about your name, so. Call me back so I can figure out what's going on with this.

Trial Transcript, Vol. II, 11/29/11 at 203. Contrary to that voicemail message in May 2009 by Iacona questioning whether Clymer knew about the accounts, Iacona testified at trial that he had discussed with Clymer the lines of credit years earlier.

Murrow also testified as to the debts incurred on the Capital One and Wells Fargo accounts, and provided summary exhibits indicating that the accounts were used overwhelm-ingly for personal rather than business-related expenses. Murrow testified that the Wells Fargo card with Clymer's

name, as opposed to the one with Iacona's name on it, was used solely for transactions that did not involve face-to-face contact, such as internet purchases or ATM withdrawals. Finally, he provided a summary chart demonstrating a pattern of balance transfers from credit card accounts for which Iacona or D&L was liable to the Capital One and Wells Fargo accounts for which Clymer was personally liable.

Iacona's defense was that the use of Clymer's name to obtain credit through Wells Fargo was done without his knowledge by Rasmussen on her own initiative in response to his directive merely to obtain a low interest credit card for the business. Although initially acknowledging that he signed the agreement at George Weber Chevrolet and the signature card at the bank, he testified that those documents may have been forwarded via fax or mail and that Rasmussen may have signed them for him. He further testified that the signatures on the checks paying the credit card bills were not uniform and were not done by him. He stated that both Rasmussen and the office assistant that eventually replaced her, Khara Moehle, handled credit card statements and that they often forged his name on checks to pay the bills when he was out of the office. In response to that testimony, the government called as a rebuttal witness Moehle, who, consistent with Rasmussen's testimony, declared that she only opened mail from attorneys related to the process serving and investigative activities of the business and that credit card statements were left for Iacona. Other than his own testimony, the only other defense witness presented by Iacona was his father-in-law who was presented as a character witness.

In closing argument, the prosecutor repeatedly highlighted the contradictions between the testimony of Iacona, and that of the other witnesses such as Rasmussen, Clymer, Murrow and Moehle. On appeal, Iacona argues that those closing statements went too far, and that by referring to Iacona as a liar the prosecutor engaged in misconduct that denied him a fair trial. Specifically, Iacona points to the following excerpts from the closing argument, which we set forth verbatim because the severity of the language and the context can be significant in evaluating such claims of prosecutorial misconduct:

> Did you hear them tell the kind of bold falsehoods Mr. Iacona swore and told to you under oath, raise your hand oath? He even denies it is his signature on the signature card at the bank, and every single payment to the credit card companies, not my signature.

Trial Transcript, Vol. IV, 12/1/11 at 159-60.

> It is the same signature on all of the checks, both when Rebecca Masmussen [sic] was there and when Khara Moehle was there. I must say, ladies and gentlemen, Khara came in as a rebuttal witness because who could have imagined Mr. Iacona would have denied writing any of the checks.

Id. at 160.

> You know, you have heard evidence through the testimony of the defendant himself and the examination of the defendant himself where you kind of get an idea about Mr. Iacona's honesty, not just here in

the courtroom or on the witness stand, but his honesty in the dealings with all sorts of people that he gets money from.

Id. at 161.

You are entitled to consider every bit of Mr. Iacona's testimony under oath here in this courtroom. It is evidence too and I submit to you ladies and gentlemen that as you evaluate, you will agree amongst yourselves that he damned himself with his false testimony; not a mistake, not a misunderstanding.

Id. at 170.

Iacona also challenges an additional statement, but it is clear that the reference in that statement is to Iacona's characterization of the government witnesses as liars, not a reference to Iacona's dishonesty, and therefore it is irrelevant to this argument. We note, however, that even if the statement were directed at Iacona, the outcome of this appeal would be the same.

In order to evaluate a claim of prosecutorial misconduct to determine if it deprived a defendant of a fair trial, we conduct a two-part inquiry. *United States v. Tucker*, 714 F.3d 1006, 1012 (7th Cir. 2013). First, we determine whether the challenged conduct was improper, and second, we evaluate the conduct in light of the trial as a whole to decide if it deprived the defendant of a fair trial. *Id.* Therefore, Iacona must establish as an initial matter that the statements were improper, and if he meets that hurdle then we consider whether the improper statements operated to deny him due process.

Iacona asserts that through those comments in closing arguments, the prosecutor accused him of lying on the witness stand multiple times and asked the jury to infer from those lies that he was a dishonest person. He maintains that such conduct was improper because it distracted the jury from its duties through sheer repetition and was not based on a fair reading of the evidence. Furthermore, he argues that the statements were prejudicial because the misconduct was severe, he did nothing to invite it, the impact was not ameliorated by jury instructions or rebuttal opportunities, and the case against him was weak.

In general, whether prosecutorial misconduct was sufficient to require judgment as a matter of law is reviewed for abuse of discretion. *United States. v. Hills*, 618 F.3d 619, 635 (7th Cir. 2010). Iacona failed to object to the statements made in closing argument, however, and therefore we review only for plain error. Accordingly, we will reverse only if Iacona can demonstrate an error that is plain, that affects his substantial rights, and that seriously affects the fairness, integrity or public reputation of the judicial proceeding, effectuating a miscarriage of justice. *United States v. Martin*, 692 F.3d 760, 763 -764 (7th Cir. 2012); *Tucker*, 714 F.3d at 1011-1012.

Iacona falters at the first step of the two-part test, in that he cannot show that the statements by the prosecutor were improper. Iacona argues that there are several limits on the ability of the government to call a defendant a liar, and that two such limits were violated here: first, the attacks were so repetitive as to go beyond the bounds of appropriate zealous advocacy and to enter into the realm of unfounded character attack; and second, the comments were not based on the

evidence introduced at trial. An analysis of the record demonstrates that neither of those contentions are valid.

We have repeatedly held that "[w]here the character and credibility of the defendant are at issue and the evidence allows the inference that the defendant has been less than truthful, the prosecutor does not err in closing argument by referring to the defendant as a liar." *United States v. Catalfo*, 64 F.3d 1070, 1080 (7th Cir. 1995); *United States v. Turner*, 651 F.3d 743, 752 (7th Cir. 2011). That does not mean the prosecutor is without limits in pursuing such a line of attack. Indeed, we have recognized that "where the terms 'fabricated' or 'lies' are used repeatedly to the point of excessiveness, the line between the 'undignified and intemperate' … and the hard or harsh but fair may be crossed with a resultant impairment of 'the calm and detached search for the truth to which a criminal trial should aspire.'" *United States v. Craig*, 573 F.2d 455, 494 (7th Cir. 1977); *Catalfo*, 64 F.3d at 1080; *United States v. Chaimson*, 760 F.2d 798, 811 (7th Cir. 1985). Therefore, we consider whether the references to Iacona's veracity in this case crossed that line.

The central question in determining whether this was error is whether the comments reflected reasonable inferences from the evidence adduced at trial rather than an expression of the prosecutor's personal opinion, and whether the comments became so excessive as to impair the jury's detached search for the truth. *Turner*, 651 F.3d at 752; *Chaimson*, 760 F.2d at 811; *Catalfo*, 64 F.3d at 1080; *United States v. Goodapple*, 958 F.2d 1402, 1409-1410 (7th Cir. 1992). If the evidence supports the comments, a prosecutor is at liberty to speak harshly about the defendant. *Turner*, 651 F.3d at 752. The statements made in this case fall comfortably within the permissible zone.

The testimony provided by Iacona was directly contra-
dicted by the testimony of multiple government witnesses, as
well as by physical evidence. In each of the challenged state-
ments, the prosecutor points out those contradictions. For
instance, in the first challenged statement, the prosecutor asks
the jury if it heard the bold falsehoods that Iacona swore under
oath, and then points to Iacona's denial that it was his signa-
ture on the signature card at the bank and on each of the
checks to the credit card companies. That was a fair character-
ization of the evidence. Iacona's contention that he did not sign
the signature card at the bank was contradicted by his own
testimony, in which he initially acknowledged that he accom-
panied Clymer to the bank to become a signatory on the
account. Moreover, his statement that the checks were not
signed by him but were handled by his office assistants was
contradicted by both Rasmussen and Moehle, who testified
consistently that Iacona handled all such bills. There was
nothing presented at trial that would establish any motive for
those employees to lie, nor was there any testimony as to any
financial or other gain that accrued to them from those credit
cards. In fact, the undisputed testimony was that the purchases
made on the cards benefitted Iacona alone. All of that evidence
rendered his statements inherently incredible, and the prosecu-
tor did not err in pointing out those credibility problems. The
second challenged statement covers similar ground, in that the
prosecutor again referenced the similarity between the
signatures on the checks, and the unlikelihood that signatures
during Rasmussen's tenure would appear so similar to those
made during Moehle's employment if signed by them and not

Iacona. That is a fair commentary on the logical import of the evidence.

The final two statements relating to Iacona's truthfulness were pleas to the jury to consider the testimony of Iacona and the history of his dealings with people, and to determine his honesty from all of that evidence. In those statements, the prosecutor emphasized to the jury that it was entitled to consider Iacona's testimony under oath as evidence and to evaluate it, and the prosecutor argued that such testimony evidenced his guilt. Iacona has failed to point to anything in those statements that is an inaccurate statement of the law. Iacona's testimony was evidence in the case, and the jury properly could determine his credibility based on all of that evidence. At no point did the prosecutor inject his personal opinion as to Iacona's credibility; instead, the prosecutor pointed out the inconsistencies between Iacona's testimony and that of the other witnesses, and encouraged the jury to consider all of that evidence in determining his credibility and his guilt. That is neither improper nor excessive, particularly in a case such as this in which the only defense presented was Iacona's testimony. In such a case, it is unremarkable that the prosecutor in closing arguments would address the veracity of the defendant's testimony in light of the testimony of the other witnesses.

As we noted in *Turner*, a "canonical statement in this field" is that a prosecutor may strike hard blows as long as they are not foul ones. *Turner*, 651 F.3d at 752; *Berger v. United States*, 295 U.S. 78, 88 (1935). Where the evidence supports an inference that the defendant has lied, then a comment in closing argument as to his credibility, including referring to him as a

liar, is a hard but fair blow, as long as the argument is made based on the evidence and not a comment as to the prosecutor's personal opinion. *Turner*, 651 F.3d at 752; *Catalfo*, 64 F.3d at 1080. That is precisely what occurred here, and accordingly the statements were not improper. Because there was no error, we need not consider the question of prejudice.

AFFIRMED.