Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/02/2016 09:10 AM CDT

State of Nebraska, appellee, v. Raymond Frank
Gonzales, Jr., also known as Raymond
Frank Gonzalez, appellant.

___ N.W.2d ___

Filed September 2, 2016.    No. S-15-149.

1. **Motions for Mistrial: Appeal and Error.** An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion.
2. **Jury Instructions.** Whether the jury instructions given by a trial court are correct is a question of law.
3. **Judgments: Appeal and Error.** When reviewing questions of law, an appellate court resolves the questions independently of the conclusion reached by the lower court.
4. **Trial: Prosecuting Attorneys: Convictions: Due Process.** Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process.
5. **Motions for Mistrial: Prosecuting Attorneys: Proof.** Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred.
6. **Trial: Prosecuting Attorneys.** When a prosecutor's comments rest on reasonably drawn inferences from the evidence, the prosecutor is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense.
7. **Attorneys at Law.** The limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument.
8. **Prosecuting Attorneys.** Language must be reviewed in its entire context to determine whether the prosecutor was expressing a personal opinion or merely submitting to the jury a conclusion that the prosecutor is arguing can be drawn from the evidence.

9. **Trial: Prosecuting Attorneys.** Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.
10. **Trial: Juries.** Hyperbole in closing arguments is hardly rare, and juries should be given credit for the ability to filter out oratorical flourishes.
11. **Trial: Prosecuting Attorneys: Due Process.** The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.
12. **Jury Instructions: Proof: Appeal and Error.** In reviewing a claim of prejudice from jury instructions given or refused, the appellant has the burden to show that the allegedly improper instruction or the refusal to give the requested instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.
13. ____: ____: ____. To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.
14. **Criminal Law: Homicide: Evidence: Jury Instructions.** It is the duty of the trial court, in homicide cases, to instruct only on those degrees of homicide that find support in the evidence.
15. **Homicide: Words and Phrases.** Sudden quarrel manslaughter is distinguished from second degree murder by the fact that the killing, even if intentional, was the result of a legally recognized provocation, i.e., the sudden quarrel, as that term has been defined by Nebraska jurisprudence.
16. **Homicide: Intent.** In determining whether a killing constitutes murder or sudden quarrel manslaughter, the question is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment.
17. **Homicide.** A passion for revenge will not mitigate murder to manslaughter.
18. **Homicide: Intent.** It is not the provocation alone that reduces the grade of the crime; it is also the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements necessary to constitute murder are absent.
19. **Homicide: Intent: Time.** If there was enough time between the provocation and the killing for a reasonable person to reflect on the intended course of action, then the mere presence of passion does not reduce the crime below murder.
20. **Homicide: Lesser-Included Offenses.** The legal assumption in a sudden quarrel manslaughter determination is that a reasonable person

would never be so greatly provoked as to intentionally strike out in anger at an innocent person.

21. **Criminal Law: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Appeal from the District Court for Dakota County: Paul J. Vaughan, Judge. Affirmed.

Todd W. Lancaster, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Wright, Connolly, Miller-Lerman, Cassel, Stacy, and Kelch, JJ.

Wright, J.

## I. NATURE OF CASE

Raymond Frank Gonzales, Jr., also known as Raymond Frank Gonzalez, appeals his convictions of first degree murder and use of a firearm to commit a felony in connection with the death of Bonnie Baker. Gonzales claims prosecutorial misconduct when, during closing arguments, the prosecutor indicated that Gonzales had lied when he denied during law enforcement interrogations that he was involved in the murder. The prosecutor also called the defense's theory of a different shooter "make believe." Gonzales further argues that the trial court erred by failing to instruct the jury, in the definition of sudden quarrel, that provocation negates the element of malice. And he claims the court erred by failing to include in the first degree murder instruction that the State must prove the killing was not the result of a sudden quarrel.

## II. BACKGROUND

On Sunday, December 15, 2013, Bonnie died at her trailer in the Atokad Trailer Park in South Sioux City, Nebraska,

of multiple gunshot wounds. Bonnie was shot 16 times with 9-mm bullets that came from the same firearm. The firearm was never found. In connection with Bonnie's death, Gonzales was convicted of murder in the first degree and use of a firearm to commit a felony. He was sentenced to life imprisonment on the murder conviction and to a consecutive term of 30 to 40 years' imprisonment on the use of a weapon conviction.

## 1. PARTY

The evidence at trial demonstrated that prior to her death, Bonnie spent the weekend in her trailer, which she shared with her brother, Elmer Baker, and her niece, Kaylynn Whitebear. Numerous people partied at the trailer over the weekend, beginning on Friday night, December 13, 2013, and continuing until Sunday morning, December 15. The guests drank beer and spirits excessively. Gonzales was one of the guests; he was brought to the party by Whitebear around 4 a.m. on Saturday. During the weekend, Elmer, Gonzales, and two other guests smoked methamphetamine in Elmer's bedroom. Bonnie kept mostly to herself in her bedroom.

Sometime around 3 a.m. on Sunday, Gonzales woke up from sleeping on the floor of the living room. He began acting erratically—yelling, falling, "flopping around on the ground," and flipping over the furniture. Elmer pushed Gonzales toward his bedroom, "because there was nothing [Gonzales could] break in there." Gonzales fell back asleep, and Elmer returned to the living room to talk for a couple of hours with another person.

## 2. SEXUAL ENCOUNTER

At approximately 5 a.m., Elmer went to his room to sleep. He lay sideways at the head of the bed, since Gonzales was sleeping sideways at the foot of the bed. According to Elmer, he awoke when Gonzales initiated sexual contact. Elmer testified that he rebuffed Gonzales' advances and fell back asleep. Elmer stated that he awoke again to similar sexual contact. This led to what Elmer described as mutual and consensual

sexual activity. This sexual activity apparently did not last very long, and Elmer and Gonzales fell asleep again. Elmer was openly homosexual. Gonzales was not.

### 3. Gonzales Upset and Teased

On Sunday morning, between 8 and 10 o'clock, Gonzales awakened and became very agitated. Elmer described that while he was sleeping, Gonzales had apparently placed Elmer's hand so that it was touching Gonzales' penis. Elmer testified that when he, Elmer, woke up to find his hand in that position, Gonzales jumped up and started "flipping out," accusing Elmer of "raping him or something." Elmer and Gonzales exited Elmer's bedroom. They engaged in a heated conversation in front of other guests, including Gonzales' friend Ira Rave. Gonzales was making accusations against Elmer that the encounter was nonconsensual, and Elmer denied the accusations.

Whitebear, Rave, and the other guests teased Gonzales, saying he was homosexual. Gonzales appeared angry. Rave teased Gonzales the most. There was no evidence that Bonnie teased Gonzales. Gonzales and Rave eventually engaged in an argument, and they pushed each other. Somebody soon intervened and broke up the fight.

Elmer testified that at one point, Gonzales told him, "I'm going to go get a gun and come back and shoot you." But when Elmer suggested that they "go outside . . . and deal with it right now," Gonzales said he was just kidding. Another witness testified similarly that Gonzales had said he "was going to go get a gun and come back and do a show or something," but that afterward, Gonzales said he was just kidding. A third witness heard Gonzales say something about guns.

The teasing and arguing continued until 10 or 11 a.m., when Bonnie asked all the guests to leave. Elmer described Bonnie as mad and stated that she was tired of everyone drinking there. Elmer thought that by the time he left, Gonzales no longer seemed angry.

Whitebear drove Gonzales to his mother's apartment. Gonzales was accompanied by Rave and two other passengers. Gonzales was mumbling to himself. One passenger testified that everyone else in the car was quiet during the ride, but Whitebear testified that the giggling and teasing of Gonzales continued in the car.

One passenger testified that Gonzales was "so calm," stating that she "g[o]t no expression from him," but Whitebear described Gonzales as "[s]till pissed off" during the car ride. Two witnesses heard Gonzales say in the car something along the lines of, "[W]hen I hit that place up, it's going to be like a fireworks show." Nobody thought at the time that Gonzales was serious.

When he exited the car, Gonzales was still wearing what he had worn the night before, although there was some evidence he had left his coat at the trailer. A photograph taken at a store on December 14, 2013, captured what Gonzales was wearing the weekend of Bonnie's murder. He had on black pants and shoes, a cobalt blue hoodie pullover sweatshirt with a large white logo on the front, a gray and black beanie hat, and a dark gray zip-up overcoat. His clothing was generally loose fitting.

After dropping off her passengers, Whitebear went to a friend's house.

### 4. EYEWITNESS DESCRIPTIONS
#### OF SHOOTER

At some point after Whitebear and all the guests had gone, Elmer left to give someone a ride. When Elmer arrived back home 20 minutes later, Bonnie was dead. The shooting occurred at approximately 1:20 p.m.

After she was shot, Bonnie ran outside to her front porch and yelled for help. Several residents of the trailer park heard Bonnie's cries and briefly saw the shooter. Six eyewitnesses testified at trial.

The eyewitnesses described the shooter as male, young, and thin. Several witnesses described the shooter as either

Native American or Hispanic. At the time of trial Gonzales was 23 years old and described as being 5 feet 10 inches tall and weighing 160 pounds; he apparently has both Native American and Hispanic heritage.

The witnesses described the shooter as wearing a hoodie pullover sweatshirt. One witness described the shooter's clothing as baggy. The color of the sweatshirt was described by various witnesses as either gray with some blue on it, turquoise, or light blue. One witness said the shooter may have been wearing a black beanie, and another said he could have been wearing a hat. Some witnesses said the shooter's hood was up. One witness described the shooter's pants as being gray. Another described his pants as khaki.

One witness described watching the shooter fire shots at Bonnie while outside the trailer and then run to a parked car some distance away. This witness saw the shooter holding what appeared to be a small firearm in the shooter's right hand while he ran away.

The witness described the vehicle as being a four-door tan Saturn, explaining that he knew a lot about cars. The witness saw the shooter enter the Saturn in the back seat. In addition to the driver, a passenger was in the front seat. The shooter rode away in the Saturn.

### 5. Gonzales' Whereabouts
#### on Day of Shooting

Testimony was adduced concerning Gonzales' whereabouts at the time of the shooting. Gonzales' sister and mother confirmed that Gonzales had arrived at his mother's apartment sometime in the morning of December 15, 2013. Gonzales' sister testified that she could tell Gonzales was still drunk from the night before even though he may have slept a few hours. Gonzales was crying and told her that a man may have taken advantage of him, though he was not sure. Gonzales' mother testified that Gonzales was weeping and that he told his sister that "somebody might have touched him when he was passed out."

About 20 minutes after Gonzales arrived at his mother's apartment, his three older cousins, David Rodriguez, Anthony Housman, and Louis Housman, came to the apartment. Gonzales' sister testified that Gonzales had told her he wanted to talk to their older cousins because "he didn't know if his manhood was taken or not." The cousins and Gonzales spoke in the kitchen.

According to Gonzales' sister, Rodriguez, Anthony, and Gonzales went outside sometime around 2 p.m. She was unsure whether they had gone for a walk or a ride, as she showered after they went outside. According to Gonzales' sister, Louis had already gone home. Rodriguez, Anthony, and Gonzales were back in the apartment by the time Gonzales' sister got out of the shower. She believed the three men had been gone around 15 to 20 minutes.

According to Gonzales' mother, Louis stayed at the apartment while Rodriguez, Anthony, and Gonzales left for a while. It was sometime between noon and 2 p.m. when they left. She did not believe they were gone more than 15 or 20 minutes, because they were back before the end of a 30-minute cartoon that another of her sons was watching.

Anthony testified that he did not go to Gonzales' mother's apartment and then leave with Gonzales. Rather, Anthony testified that he picked up Gonzales at the Atokad Trailer Park on December 15, 2013, after learning that Gonzales needed a ride. He said Rodriguez accompanied him to pick up Gonzales. Anthony could not say what time this occurred; he believed it was daytime. Anthony testified that when they picked Gonzales up, he was on the road, walking.

Rodriguez similarly testified that Gonzales called him and asked him to pick him up at the Atokad Trailer Park. Rodriguez was unclear what time this occurred, other than that it was before 1 or 2 p.m. Rodriguez testified he accompanied Anthony to pick up Gonzales. They met Gonzales on a road in the Atokad Trailer Park. Rodriguez testified

that after picking Gonzales up, they took him to Gonzales' mother's apartment.

Louis testified that he had no recollection of seeing Gonzales or visiting Gonzales' mother's apartment on December 15, 2013.

Gonzales' mother's apartment is an approximately 14-minute drive from Bonnie's trailer. Rodriguez' and Anthony's residences are located between Bonnie's trailer and Gonzales' mother's apartment. Rodriguez' residence is 9 minutes' drive from Bonnie's trailer, and Anthony's residence is 11 minutes' drive from Bonnie's trailer.

### 6. Tan Saturn

It is undisputed that Anthony owned a tan, four-door Saturn. In the morning on December 16, 2013, law enforcement inspected the Saturn with Anthony's permission, but did not seize it. At the time of this initial inspection, the officers observed that the floormats were tan.

A warrant was obtained, and the Saturn was seized around 5 p.m. on the following day, December 17, 2013. The officers immediately noticed that the floormats were different. They were black and appeared to be new. Also, the Saturn appeared to have been emptied of any paper, cans, wrappers, or other items that law enforcement expected to find, based on their initial inspection. Anthony told law enforcement that he had washed the Saturn earlier that day. The tan floormats were never recovered.

Though samples were taken from the Saturn for DNA testing, none tested positive for hemoglobin, and no other forensic evidence was found in the Saturn.

### 7. Gun

Law enforcement officers searched Gonzales' residence, as well as his mother's apartment, Rodriguez' residence, and Anthony's residence. The officers found a .357-caliber revolver at Anthony's residence. That revolver was traced as having been stolen during a home invasion robbery. The

victim of the robbery reported the theft of two 9-mm handguns in addition to the .357-caliber revolver, although no 9-mm handguns were found during the searches. The bullets used to shoot Bonnie were consistent with 33 different makes and models of 9-mm firearms.

### 8. GONZALES' INTERVIEW

Gonzales was arrested at approximately 9:40 p.m. on December 15, 2013. The arresting officer observed that Gonzales appeared to have showered and to have on clean clothes. Gonzales agreed to be interviewed, and he was interviewed three times. When asked about the clothes he had worn on the weekend, Gonzales said they were at home. He explained that there was blood on the blue sweatshirt he had been wearing, because he had accidentally cut himself the night before.

Concerning his whereabouts at the time of the shooting, Gonzales said in one interview that he was at his mother's apartment and then left with Rodriguez and Anthony to go to Anthony's residence. Gonzales said that he stayed there 2 to 3 hours and then went home.

Throughout the three interviews, Gonzales repeatedly and consistently denied being involved in Bonnie's shooting or being at the Atokad Trailer Park at the time of the shooting. Indeed, as characterized by counsel, he denied being involved in the shooting "dozens of times."

Then law enforcement officers told Gonzales that they were just trying to give Gonzales an opportunity to tell his side of the story, Gonzales told law enforcement that he already had. When the officers continued to press Gonzales, he said, "I got my story, I'm sticking to my story."

Defense counsel emphasized that Gonzales' consistent and repeated denial of any involvement in the shooting was in the face of hours of interrogation by officers trained on how "to get people to open up and make statements if they have incriminating evidence."

### 9. Gunshot Residue on
### Gonzales' Hand

On December 16, 2013, after law enforcement's first interview with Gonzales, a police identification technician collected samples from Gonzales' hands to analyze for gunshot residue. The technician testified that there are three ways gunshot residue can get on a subject's hands; either the subject discharged a firearm, the subject was in the vicinity of a firearm being discharged, or the subject came into contact with a surface that had gunshot residue on it.

Tests on scanning electron microscope "stub" samples revealed the presence of 1 three-component particle, 1 two-component particle, and 11 one-component particles on Gonzales' right hand. On Gonzales' left hand, the tests of those samples revealed 0 three-component particles, 2 two-component particles, and 13 one-component particles. A swab sample, which is a presumptive field test, revealed 0 three-component particles, 0 two-component particles, and 1 one-component particle.

The technician explained that gunshot residue consists of lead, barium, and antimony. Three-component particles are composed of all three elements; furthermore, the shape of the particle demonstrates whether the elements were exposed to a very-high-heat reaction. Three-component particles are highly specific to the discharge of a firearm.

Two-component particles do not have very many other sources besides the discharge of a firearm. But they are also consistent with sources such as brake pad linings, fireworks, or a deployed airbag.

One-component particles, in addition to being consistent with the discharge of a firearm, are consistent with a number of other sources such as car batteries, paint, stained glass windows, and certain paper products.

When he was arrested, Gonzales' hands were not bagged to avoid possible contamination by touching something that might have gunshot residue on it. Because Gonzales' hands

were not bagged, the technician admitted that it was possible Gonzales' hands could have become contaminated by gunshot residue if it was present in the police vehicle that transported him to the station or present in the room where he was interrogated. The technician stated that bagging the hands is recommended both in order to avoid contamination and to eliminate particle loss due to wiping or washing one's hands.

### 10. GONZALES' CLOTHES NEVER FOUND

The law enforcement officers investigating Bonnie's death were never able to locate the clothing that Gonzales wore during the weekend of December 15, 2013, including his shoes. Elmer eventually found Gonzales' coat that had been left in the trailer.

### 11. STATE'S CLOSING ARGUMENTS

In both opening statements and closing argument, the prosecutor characterized the case as being about "embarrassment" and "rage." The prosecutor argued that the encounter with Elmer was Gonzales' motive for shooting whoever he found at the trailer. He argued that Gonzales' "stunt double" did not "jump[] into" a car matching the description of Anthony's Saturn and that any defense theory that this was a random act by an "anonymous drug dealer" was "make believe" and "science fiction."

The State argued that any theory by defense counsel that the shooter was Louis or one of Gonzales' other cousins was "just make believe." The State argued further, "That's just making things up. That's a red herring." The State, after reminding the jury that it was not to base its decision on speculation and conjecture, said, "[W]hen the gentleman there made that fact up that's exactly what that was. That wasn't the evidence. That was just mere speculation, that was just creating something."

The prosecutor reviewed with the jury the fact that during interviews with law enforcement, Gonzales, in denying

shooting Bonnie, repeatedly said that was his story and he was sticking with it. The prosecutor then argued, "I suggest to you that that's exactly what it is, it's a story." The State then argued that Gonzales was acting evasive during the interviews with law enforcement and that he was minimizing how much he was upset by the encounter with Elmer.

The prosecutor utilized an analogy of "Johnnie" who denies having eaten a slab of chocolate cake. Johnnie blames his circumstances on aliens who beamed down and put chocolate cake all over Johnnie's hands and face. The State asked rhetorically whether Johnnie's denial would have more weight if he denied eating the cake 15 times. The State reminded the jury, "I think everybody agreed [in voir dire] that once a lie, always a lie. You can repeat that lie, it doesn't change it."

The prosecutor displayed a checklist to the jury. The checklist included items such as "Fits general description of shooter," "Was at the party at Lot #4 preceding the shooting," "Felt was taken advantage of by a man from that party," "Was crying and upset about being taken advantage of," "Said he would light Lot #4 up like the 4th of July," "Had the motive to kill EB [sic]," and "Had the rage to kill anyone in the trailer/BB."

The list also included the statement, "Was in the vicinity of Lot #4 ATP at the time of the shooting." In placing a checkmark by this item in the list, the prosecutor argued that the shooter had to have known Anthony. And, again, in referring to the possibility that the shooter was Louis, the "[m]an on the moon," or a "[r]andom drug dealer," the prosecutor said, "That's just make believe."

Another item on the list was, "Lied about [being] in the vicinity of Lot #4 at time of the shooting." The prosecutor placed a checkmark by that statement on the list, reading it out loud to the jury.

Defense counsel had not objected at the time the prosecutor originally commented about the defense's theory's being "make believe," "science fiction," and based on speculation,

nor at the time the prosecutor said that Gonzales' "story" or statements to law enforcement were "exactly [t]hat[,] a story." Defense counsel did object when the State placed a checkmark next to "Lied about [being] in the vicinity of Lot #4 at time of the shooting."

The court sustained defense counsel's objection that the prosecutor was improperly commenting on the credibility of a witness. The prosecutor then scribbled over "Lied about" and wrote above the scribble: "Denied Dozens of times."

Then the prosecutor said:

Denied dozens of times. That's a big one, isn't it?

All right. If I'm the shooter, I ain't — I ain't — No way I'm putting myself in that — in that vicinity of the Trailer Park; right? . . . Rodriguez does. Yeah, I was there, picking a guy up.

I'm not doing it. I'm not within miles of that Trailer Park. Not miles? No. Not miles at the time of the shooting. I never went back there. Never. That's what I'd say. I'm not going to put myself right back in that spot after I did it.

The prosecutor closed with a summary of the events of December 15, 2013, and how a shooter killed Bonnie and ran into a car to escape the scene of the crime. The prosecutor then said, "That's the man (indicating), right there. That's the man that killed Bonnie . . . ."

## 12. Motion for Mistrial

Defense counsel moved for a mistrial based on the prosecutor's statements during closing arguments. Particularly, defense counsel objected to the statements by the prosecutor about Gonzales' "story" or account's being "exactly [t]hat[,] a story"; the prosecutor's comments analogizing Johnnie's denial of eating the cake several times to Gonzales' repeated denial and asserting, "once a lie, always a lie"; and the prosecutor's use of a checklist wherein he checked off a statement that Gonzales had "[l]ied" about being in the vicinity at the time of the shooting.

The judge denied the motion for mistrial but instructed the jury as follows:

[D]uring the closing statement the prosecutor made some comments which were in reference to the credibility of [Gonzales] or to the credibility of witnesses, it's improper for Counsel to make arguments regarding their belief that someone lied or their credibility.

And so I'm going to ask you to disregard the comments regarding [Gonzales'] statement that it was his story and he was sticking to it or once a lie always a lie. Those type of comments are improper and you should disregard those.

As I had reminded you in the instructions, comments of Counsel is not evidence. This is just their inference of the — of the evidence submitted.

So with that notation, though, I want you to disregard [the prosecutor's] comments regarding [Gonzales'] credibility.

### 13. Defense Counsel's Closing Arguments

During trial, defense counsel had pointed out that Louis and Gonzales were of similar build and had similar features. Defense counsel suggested that Louis could have been the shooter. Defense counsel also pointed out the consistency of Gonzales' denials to law enforcement despite being interrogated over several hours by "experienced law enforcement officers, with training in techniques to get people to open up and make statements." And defense counsel generally pointed out the "holes" in the State's case. Defense counsel reminded the jury that the State's arguments were not evidence.

### 14. Jury Instructions

At the jury instruction conference, defense counsel had asked the court that the jury be instructed on the "negative element" of first degree murder that Gonzales did not kill Bonnie upon a sudden quarrel. Additionally, defense counsel had asked that the jury be instructed as follows: "In your

*preliminary* deliberations on Count I, you may consider the crimes of first degree murder, second degree murder, and manslaughter in any order." (Emphasis supplied.)

Finally, defense counsel asked that the jury be instructed on the definition of sudden quarrel as

> a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control. It does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim. The question is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment. It is not the provocation alone that reduces the grade of the crime, but, rather, the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements necessary to constitute murder are absent. Provocation negates the element of malice found in the crime of first degree murder.

The court generally denied these requested instructions. Instead, instruction No. 5 was given. Instruction No. 5 first summarized that as to count I, the jury could find Gonzales guilty of first degree murder, second degree murder, or manslaughter or could find Gonzales not guilty.

Instruction No. 5 then set forth an "Elements" section and an "Effects of Findings" section. The Elements section was presented first.

Under the Elements section, the jury was instructed that to find Gonzales guilty of first degree murder, the jury must find that the State proved beyond a reasonable doubt that Gonzales killed Bonnie purposely and with deliberate and premeditated malice.

To find Gonzales guilty of second degree murder, the jury was instructed that it must find the State proved beyond a reasonable doubt that Gonzales killed Bonnie and that he did so intentionally and not as a result of a sudden quarrel.

To find Gonzales guilty of manslaughter, the jury was instructed that it must find the State proved beyond a reasonable doubt that Gonzales killed Bonnie either intentionally upon a sudden quarrel or unintentionally in the commission of an unlawful act, to-wit, by Gonzales' knowingly, intentionally, or recklessly causing bodily injury to Bonnie.

The Effect of Findings section followed. That section explained in detail how the jury must consider each of the crimes listed under count I "in sequence, beginning with First Degree Murder, then Second Degree Murder, and then Manslaughter, until you unanimously find the defendant guilty of one of these three crimes or until you unanimously find him not guilty of all three of the crimes listed in Count I."

A separate instruction contained the definitions generally applicable to the case. "Deliberate" was defined as "not suddenly or rashly. Deliberation requires that one considered the probable consequences of his or her actions before acting." "Malice" was defined as the "intentional doing of a wrongful act without just cause or excuse."

"Sudden quarrel" was defined as

> a legally recognized and sufficient provocation causing a reasonable person to lose normal self-control; or passion suddenly aroused which clouds reason and prevents rational action. It does not necessarily require an exchange of angry words or an altercation contemporaneous with the killing and does not require a physical struggle or other combative bodily contact between the defendant and the victim.

### III. ASSIGNMENTS OF ERROR

Gonzales assigns that the trial court erred in (1) not granting a mistrial based on prosecutorial misconduct during

closing argument, (2) finding sufficient evidence to support a verdict of first degree murder, and (3) instructing the jury concerning the elements of first degree murder without instructing the jury that the State had to prove the killing was not a result of a sudden quarrel brought about by sufficient provocation.

## IV. STANDARD OF REVIEW

[1] We will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion.[1]

[2,3] Whether the jury instructions given by a trial court are correct is a question of law.[2] When reviewing questions of law, an appellate court resolves the questions independently of the conclusion reached by the lower court.[3]

## V. ANALYSIS

### 1. Prosecutorial Misconduct

[4,5] We begin by addressing Gonzales' assignment of error alleging prosecutorial misconduct. When considering a claim of prosecutorial misconduct, we first consider whether the prosecutor's acts constitute misconduct.[4] A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[5] But if we conclude that a prosecutor's acts were misconduct, we consider whether the misconduct prejudiced the defendant's right to a fair trial.[6] Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting

---

[1] See *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

[2] *State v. Casterline*, 293 Neb. 41, 878 N.W.2d 38 (2016).

[3] *Id.*

[4] *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016).

[5] *Id.*

[6] *Id.*

conviction violates due process.[7] Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred.[8]

### (a) Were Statements Misconduct?

Public prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial.[9] While a prosecutor should prosecute with "earnestness and vigor" and "may strike hard blows, he is not at liberty to strike foul ones."[10]

[6] Gonzales points out that according to the American Bar Association, "[t]he prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant,"[11] and that the Nebraska Rules of Professional Conduct state that a lawyer shall not, in trial, "state a personal opinion as to . . . the credibility of a witness . . . or the guilt or innocence of an accused."[12] But we have explained that when a prosecutor's comments rest on reasonably drawn inferences from the evidence, the prosecutor is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense.[13] Thus, in cases where

---

[7] *Id.*

[8] *State v. Green*, 287 Neb. 212, 842 N.W.2d 74 (2014).

[9] *State v. Barfield*, 272 Neb. 502, 723 N.W.2d 303 (2006), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

[10] *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).

[11] 1 ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3-5.8(b) (3d ed. 1993).

[12] Neb. Ct. R. of Prof. Cond. § 3-503.4(e).

[13] See *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

the prosecutor comments on the theory of defense, the defendant's veracity, or the defendant's guilt, the prosecutor crosses the line into misconduct only if the prosecutor's comments are expressions of the prosecutor's personal beliefs rather than a summation of the evidence.[14]

The principle behind the prohibition of expressing personal opinions on the defendant's veracity and guilt is that when a prosecutor asserts his or her personal opinions, the jury might be persuaded by a perception that counsel's opinions are correct because of his position as prosecutor, rather than being persuaded by the evidence.[15] The prosecutor's opinion carries with it the imprimatur of the government and may induce the jury to trust the government's judgment rather than its own view of the evidence.[16] Moreover, the jury is aware that the prosecutor has prepared and presented the case and consequently may have access to matters not in evidence; thus, the jury may infer that such matter precipitated the prosecutor's personal opinion.[17]

[7] Some courts appear to hold that it is per se misconduct to say that the defendant lied or is a liar.[18] While there is authority that discourages prosecutors from using terms such as lied or liar in arguments to the jury, we are unpersuaded that a per se rule is appropriate. After all, closing

---

[14] See, *U.S. v. Iacona*, 728 F.3d 694 (7th Cir. 2013); *U.S. v. Stover*, 474 F.3d 904 (6th Cir. 2007); *State v. Graves*, 668 N.W.2d 860 (Iowa 2003).

[15] See, *Beaugureau v. State*, 56 P.3d 626 (Wyo. 2002); *State v. Campbell*, 241 Mont. 323, 787 P.2d 329 (1990); *Wilson v. People*, 743 P.2d 415 (Colo. 1987).

[16] *United States v. Young*, 470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).

[17] *State v. Whipper*, 258 Conn. 229, 780 A.2d 53 (2001), *overruled on other grounds, State v. Grant*, 286 Conn. 499, 944 A.2d 947 (2008).

[18] See, *Wend v. People*, 235 P.3d 1089 (Colo. 2010); *State v. Hilton*, 79 Conn. App. 155, 829 A.2d 890 (2003); *Gomez v. State*, 751 So. 2d 630 (Fla. App. 1999); *State v. Graves, supra* note 14; *Haddock v. State*, 282 Kan. 475, 146 P.3d 187 (2006); *State v. Campbell, supra* note 15.

arguments often have a "'rough and tumble quality about them, . . . the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument.'"[19]

[8] Instead, we adopt the approach that looks at the entire context of the language used to determine whether the prosecutor was expressing a personal opinion or merely submitting to the jury a conclusion that the prosecutor is arguing can be drawn from the evidence.[20] If the prosecutor is commenting on the fact that the evidence supports the inference that the defendant lied, as opposed to a personal opinion carrying the imprimatur of the government, the comment is not misconduct.[21] This is distinguishable from calling the defendant a "liar," which is more likely to be perceived as a personal attack on the defendant's character.

In *State v. Nolan*,[22] we found that the prosecutor's argument that defense counsel was going to use "'smoke screens and mirrors,'" was not misconduct. We reasoned that the prosecutor's statement was made in the context of what the State believed the evidence showed and the prosecutor's belief that defense counsel was going to try to divert the jurors' attention from that evidence.[23]

---

[19] *State v. Hampton*, 66 Conn. App. 357, 373, 784 A.2d 444, 455 (2001).

[20] See, *U.S. v. Iacona, supra* note 14; *U.S. v. Delgado*, 672 F.3d 320 (5th Cir. 2012); *U.S. v. Kravchuk*, 335 F.3d 1147 (10th Cir. 2003); *People v. Boyette*, 29 Cal. 4th 381, 127 Cal. Rptr. 2d 544, 58 P.3d 391 (2002); *Lugo v. State*, 845 So. 2d 74 (Fla. 2003); *Pacifico v. State*, 642 So. 2d 1178 (Fla. App. 1994); *State v. Cordeiro*, 99 Haw. 390, 56 P.3d 692 (2002); *State v. Graves, supra* note 14; *Com. v. Coren*, 437 Mass. 723, 774 N.E.2d 623 (2002); *State v. Davis*, 311 P.3d 538 (Utah App. 2013).

[21] See, *Com. v. Coren, supra* note 20; *People v. Howard*, 226 Mich. App. 528, 575 N.W.2d 16 (1997).

[22] *State v. Nolan*, 292 Neb. 118, 135, 870 N.W.2d 806, 822 (2015).

[23] *Id.*

In *U.S. v. Hernandez-Muniz*,[24] the court found no misconduct based on the prosecutor's statements in closing arguments urging that the jury would "'have to agree that there were some lies told during the course of this case'" and characterizing the defendant's statement as "a 'lie'" after drawing the jury's attention to conflicting testimony among the defendant and other witnesses. The court stated that while a prosecutor would be well advised to avoid directly accusing a defendant of lying,[25] the comments, in context, were not improper. They were in response to arguments by opposing counsel and were only a commentary on the evidence.

In *U.S. v. Delgado*,[26] the court similarly held that the prosecutor did not commit misconduct by arguing in closing arguments that the defendant had lied. The court noted that "context is crucial"[27] and that the prosecutor's statement was made in response to defense counsel's attack of government witnesses and after a detailed summary of the evidence. The statement that the defendant lied, the court explained, was a commentary on what the evidence showed; it was not an assertion of the prosecutor's personal opinion or an attack on the defendant's character.[28] The court also distinguished asserting that the defendant had lied from describing the defendant as a liar.[29] Finally, the court placed weight on the fact that the prosecutor did not use "'expressions such as "I think," "I know," "I believe,"'" or other expressions that convey a personal opinion.[30]

Here, the prosecutor did not call Gonzales a "liar" and did not preface any statement in a way that conveyed a personal

---

[24] *U.S. v. Hernandez-Muniz*, 170 F.3d 1007, 1012 (10th Cir. 1999).

[25] *Id.*

[26] *U.S. v. Delgado, supra* note 20.

[27] *Id.* at 335.

[28] *U.S. v. Delgado, supra* note 20.

[29] *Id.*

[30] *Id.* at 337.

opinion. To the contrary, the statements complained of on appeal were in the context of a detailed summation of the evidence. The prosecutor's comments were also in response to defense counsel's emphasis on the number of times that Gonzales denied committing the crime. The prosecutor's statements are properly viewed as a commentary on the evidence presented at trial, as opposed to an expression of personal opinion.

We encourage prosecutors to preface any questionable statements with the phrase, "the evidence shows." But viewed in context, it is clear that the prosecutor's statement that Gonzales lied, as well as the prosecutor's dramatic summations of defense counsel's theories as "science fiction" and the like, was nothing more than commentary on what the prosecutor believed the evidence showed. We do not conclude that the prosecutor was stating a personal belief based on personal knowledge. Thus, we find no misconduct.

### (b) Were Statements Prejudicial?

[9] In any event, the statements complained of in this appeal were not unfairly prejudicial. Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.[31] In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction.[32]

[10] Hyperbole in closing arguments is hardly rare, and juries should be given credit for the ability to filter out

---

[31] *State v. McSwine, supra* note 4.

[32] *Id.*

oratorical flourishes.[33] In this case, the alleged prosecutorial misconduct was limited to statements made in closing arguments and did not inundate the trial. The objected-to statements were largely hyperbole. And the court gave a lengthy curative instruction. In that curative instruction, the court emphasized for the jury that the prosecutor's comments were not evidence and that the jurors were to disregard any of the prosecutor's comments regarding Gonzales' credibility.

[11] The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Consequently, "the aim of due process 'is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'"[34] The prosecutor's comments in this case, even if they could be considered misconduct, did not deprive Gonzales of his right to a fair trial.

## 2. JURY INSTRUCTIONS

We turn next to Gonzales' assignment of error concerning the jury instructions. Gonzales asserts that the court erred by failing to instruct for first degree murder that the jury must find the "negative element" that the killing was not upon a sudden quarrel.[35] He also asserts that he was prejudiced because the trial court failed to specify in the definition of sudden quarrel that provocation negates the element of malice.

[12,13] In reviewing a claim of prejudice from jury instructions given or refused, the appellant has the burden to show that the allegedly improper instruction or the refusal to give the requested instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.[36] To

---

[33] *State v. Barfield, supra* note 9.

[34] *Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).

[35] Brief for appellant at 41. See *State v. Hinrichsen*, 292 Neb. 611, 877 N.W.2d 211 (2016).

[36] *State v. Casterline, supra* note 2.

establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[37]

[14] It is the duty of the trial court, in homicide cases, to instruct only on those degrees of homicide that find support in the evidence.[38] And where the evidence shows that the defendant purposely pointed a loaded gun at another and pulled the trigger, and there is no evidence of a sudden quarrel or other condition that might permit a finding that there was an absence of malice, then the court is not required to give an instruction that would permit the jury to render a verdict of manslaughter.[39] We conclude that Gonzales' tendered instructions were not warranted by the evidence, because the facts do not permit a finding that the shooting of Bonnie was without malice and upon a sudden quarrel.

[15,16] Sudden quarrel manslaughter is distinguished from second degree murder by the fact that the killing, even if intentional, was the result of a legally recognized provocation, i.e., the sudden quarrel, as that term has been defined by our jurisprudence.[40] Such provocation is an extenuating circumstance that mitigates the killing.[41] The question is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment.[42]

---

[37] *Id.*

[38] *State v. Freeman*, 201 Neb. 382, 267 N.W.2d 544 (1978).

[39] See *State v. Hardin*, 212 Neb. 774, 326 N.W.2d 38 (1982).

[40] See *State v. Smith*, 282 Neb. 720, 806 N.W.2d 383 (2011).

[41] See *id.*

[42] *Id.*

[17] The test is an objective one.[43] A passion for revenge will not mitigate murder to manslaughter.[44] Qualities peculiar to the defendant which render him or her particularly excitable are not considered.[45] The concept of manslaughter was not intended to excuse a defendant's subjective personality flaws.[46] "The concept of manslaughter '"is a concession to the infirmity of human nature, not an excuse for undue or abnormal irascibility. . . ."'"[47]

A quarrel is generally defined as an altercation, an angry dispute, or an exchange of recriminations, taunts, threats, or accusations between two persons.[48] A quarrel justifying the lesser offense of manslaughter is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control.[49] It is "'"severe"'" provocation.[50]

[18,19] And it is not the provocation alone that reduces the grade of the crime; it is also the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements necessary to constitute murder are absent.[51] Thus, if there was enough time between the provocation and the killing for a reasonable person to reflect on the intended course of action, then the mere presence of passion does not reduce the crime below murder.[52] The inquiry is whether the suspension

---

[43] *Id.*

[44] See 2 Wayne R. LaFave, Substantive Criminal Law § 15.2 (2d ed. 2003).

[45] *Id.*

[46] *State v. Dubray, supra* note 13.

[47] *State v. Lyle*, 245 Neb. 354, 364, 513 N.W.2d 293, 302 (1994), quoting *Com. v. Pirela*, 510 Pa. 43, 507 A.2d 23 (1986).

[48] See *State v. Morrow*, 237 Neb. 653, 467 N.W.2d 63 (1991).

[49] *Id.*

[50] See *State v. Cave*, 240 Neb. 783, 790, 484 N.W.2d 458, 464 (1992).

[51] *Id.*

[52] See *State v. Lyle, supra* note 47.

of reason reasonably continued from the time of provocation until the very instant of the act producing death took place.[53] "'[I]f, from any circumstances whatever shown in evidence, it appears that the [defendant] reflected and deliberated, or if in legal presumption there was time or opportunity for cooling, the provocation [cannot] be considered by the jury in arriving at [its] verdict.'"[54]

Assuming without deciding that the alleged provocation in this case was sufficient to cause a reasonable person to act rashly and from passion, the evidence failed to permit a finding that any such suspension of reason reasonably continued from the time of the provocation until the time Bonnie was killed. The shooting occurred at least 5 hours from the time of the alleged sexual assault and at least 2 hours from the time that the teasing about that encounter had ceased. The evidence was uncontroverted that when being teased at the trailer, Gonzales threatened to go get a gun and come back and shoot people. If the jury believed that Gonzales was the shooter, the evidence was that he did precisely that. Gonzales retrieved a gun, arranged a ride back to the trailer, and shot Bonnie 16 times. Both the length of time from the allegedly sufficient provocation and the calculating nature of leaving the scene to retrieve a weapon indicate that the killing did not occur under a reasonably continuing suspension of reason.

In cases where there was a much shorter cooling-off period, but the defendant left the scene of the provocation and returned later with a weapon, we have held that the evidence did not support an instruction on manslaughter. For instance, in *State v. Lyle*,[55] we held that the 20-minute time period between the provocation and the killing, in which time the defendant left, obtained a gun, and returned to the vicinity of the fight, was inconsistent with sudden quarrel manslaughter.

---

[53] See *id.*

[54] *Id.* at 360, 513 N.W.2d at 300.

[55] *State v. Lyle, supra* note 47.

Similarly, in *State v. Freeman*,[56] we held that there was no evidence from which a jury could infer that the murder was upon a sudden quarrel when the victim was stabbed 14 times after the defendant had gone to the kitchen to procure the knife and returned to the victim's bedroom.

Furthermore, Gonzales did not kill Elmer, Rave, or any other person who allegedly provoked him. He killed Bonnie, who by all accounts was involved in these events only to the extent that she asked everyone to leave the trailer. There was no evidence of any kind of quarrel between Bonnie and Gonzales before she was shot.

The majority rule is that the lesser crime of manslaughter may be justified when the defendant kills a third party who was not responsible for the acts of provocation when (1) the defendant is mistaken that the person is responsible for the acts of provocation or (2) the defendant attempts to kill the provoker but accidentally kills an innocent bystander.[57] But courts have consistently held that it is not manslaughter when the defendant strikes out in rage and intentionally kills a person known by the defendant at the time to be innocent of the provocation.[58]

[20] The legal assumption is that a reasonable person would never be so greatly provoked as to intentionally strike out in anger at an innocent person.[59] Thus, in *State v. Bautista*,[60] we held that it was not error for the trial court to refuse to instruct on manslaughter when the defendant went back to a bar looking for the man he had been in a fight with and, not finding him, killed the provoker's father.

---

[56] *State v. Freeman, supra* note 38.

[57] See 2 LaFave, *supra* note 44 (and cases cited therein).

[58] See *id*.

[59] See *id*.

[60] *State v. Bautista*, 193 Neb. 476, 227 N.W.2d 835 (1975). See, also, *State v. Cave, supra* note 50.

There was no evidence from which the jury could have concluded that Gonzales had mistaken Bonnie for someone else, had accidentally struck her while aiming his weapon at a provoker, or was blindly striking out in an immediate response to provocation. Instead, the killing appears to be an act of vengeance upon the only person Gonzales could find present when he returned to the trailer with a gun. And, as stated, a passion for revenge will not mitigate murder to manslaughter.[61] Even if the shooting could be viewed as an act less subjectively calculating, the evidence supports nothing more than undue irascibility, which is likewise not grounds for a manslaughter instruction.[62] A reasonable person under the provocation alleged in this case would not intentionally shoot a person indisputably innocent of the provocation, especially given the lengthy cooling-off period that had passed.

For these reasons, we conclude that the evidence did not support a finding of sudden quarrel manslaughter. Because the evidence did not support a finding of sudden quarrel manslaughter, there can be no reversible error based on the alleged deficiencies in the instructions on sudden quarrel manslaughter.

### 3. Sufficiency of Evidence

[21] Lastly, we address Gonzales' claim that the evidence was insufficient to support the verdict. In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[63] The relevant question for an appellate court

---

[61] See 2 LaFave, *supra* note 44.

[62] *State v. Lyle, supra* note 47.

[63] *State v. Casterline, supra* note 2.

is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

There was evidence that on the day of the killing, Gonzales had threatened to return to the trailer and shoot the place up like a "fireworks show." Eyewitness reports of the shooter generally match the description of Gonzales as he appeared that day, and one eyewitness described the getaway vehicle as being of a make, model, and color similar to the car belonging to Gonzales' cousin Anthony. Gonzales' relatives testified that Gonzales' whereabouts could not be confirmed for a period of time close to the time of the shooting. Rodriguez and Anthony testified that they picked Gonzales up at the Atokad Trailer Park, even though numerous other witnesses attested that Whitebear had driven Gonzales home from the party, and Gonzales claimed that he did not return to the trailer park after going home. When Gonzales was arrested, there was gun residue on his hands, he had showered, the clothes he wore the day of the killing were never located, and Gonzales told officers that if they did find his clothes, they might find his blood on his shirt. The evidence was sufficient to convict Gonzales of first degree murder and use of a firearm to commit a felony.

## VI. CONCLUSION

For the foregoing reasons, we find no merit to Gonzales' assignments of error. We affirm the judgment of the trial court.

AFFIRMED.