IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MARSH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

ROGER L. MARSH, APPELLANT.

Filed June 18, 2024.    No. A-23-487.

Appeal from the District Court for Douglas County: JAMES M. MASTELLER, Judge. Affirmed.

Jason E. Troia, of Dornan, Troia, Howard, Breitkreutz, Dahlquist & Klein, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

PIRTLE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial in the Douglas County District Court, Roger L. Marsh was convicted of attempted first degree assault and use of a deadly weapon to commit a felony. The district court sentenced him to 5 to 15 years' imprisonment on each count, to be served consecutively. Marsh appeals, claiming there was insufficient evidence to support his conviction and his sentence was excessive. He also asserts numerous claims of ineffective assistance of trial counsel. We affirm Marsh's convictions and sentences.

## II. BACKGROUND

### 1. CHARGES

In March 2022, Marsh made verbal threats to fight with Donovan Love and later showed up at Love's residence. As Love drove away from his home, Marsh allegedly fired a gun in Love's direction, striking the back of the front passenger seat of Love's vehicle. A couple months later, the State filed an information in the district court charging Marsh with two counts: count 1, attempted first degree assault, pursuant to Neb. Rev. Stat. §§ 28-308 and 28-201 (Reissue 2016), a Class IIA felony; and count 2, use of a deadly weapon to commit a felony, pursuant to Neb. Rev. Stat. § 28-1205(1)(a) and (c) (Reissue 2016), a Class IC felony. The State later filed an amended information maintaining those charges but changing the date of the alleged offenses.

### 2. TRIAL

A jury trial was held in April 2023. Evidence was presented through witness testimony, photographs, and video recordings. A summary of the evidence follows.

#### (a) Love's Testimony

Love testified that on March 5, 2022, his girlfriend Lisa Roum and her adult son, Malec Roum, along with Malec's friends, were at Love's house to watch a pay-per-view fight on television. Love was not Malec's biological father, but they generally had "a decent relationship." Marsh is Malec's father. That night, Malec had been drinking and began arguing with Lisa. Lisa instructed Love to drive Malec home, but Malec declined and started walking home. Lisa did not want Malec walking home alone and, out of concern, requested that Love follow Malec in his vehicle to ensure he returned home safely. Love found Malec walking along the sidewalk and followed "behind him slowly[,] watching him walk." Malec began yelling profanities at Love, entered the street, and "slammed his body into . . . [Love's] side-view mirror," cracking it open. Love exited the vehicle and began walking towards Malec, when Malec "t[ook] a swing at [Love]." According to Love, Malec "lost his footing and fell on the ground." Love held Malec down and told him that he would let him go once he had calmed down. When Malec calmed down, Love let go of him and, out of frustration, left him to walk home alone.

About 30 minutes after he returned home, Love received a phone call from Malec's number. Malec accused him of "put[ting] his hand on [him]." Love could hear Marsh in the background stating that he was going to "come and get [Love]" at his house. Love told him, "'Come on,'" and then went outside and sat on his porch waiting for Marsh's arrival until about "4:00 or 5:00 in the morning." During that time, "there were multiple calls where [Marsh and Malec were] talking about . . . com[ing] over." Marsh called from his own phone number and threatened to "come fight [Love]." Love eventually blocked Marsh and Malec's numbers and went inside at "about 5:00" in the morning.

Later in the morning on March 6, 2022, at approximately "7:00, 8:00," Love started getting ready for a family event. He was to bring water and food to the event, so he began loading cases of water into his vehicle. Video evidence showed Love's vehicle backed into the driveway, with the front of the car facing the street. As he was loading the water into the rear passenger side of the vehicle, Marsh arrived in his truck and "jumped out" of the front passenger side of the truck.

Love did not know who was driving the vehicle. Love began approaching Marsh, when Marsh pulled a gun "[o]ut of his pocket" and started "trying to cock it at [Love]." Love stated that the gun appeared to be a .25 caliber pistol. Love knew this because his brother owned one. When Love "heard the click" of the pistol, he "took off and ran . . . [to] the driver's side of [his] car." On cross-examination, when asked if he would have "beat [Marsh] up" if he had made it to Marsh before "he got whatever he had in his pocket out," Love responded, "Probably." Once Love was in his vehicle, Marsh stood in front of the vehicle and pointed the gun at Love through the windshield. In an attempt to run over Marsh, Love pressed on the gas pedal. However, his vehicle was only in "warming mode," so the engine "rev[ved] up" but did not move forward. Marsh then went to the passenger side of the vehicle and Love started his vehicle so he could drive away.

At this point, the rear passenger door was still open since Love had been loading water in the vehicle when Marsh arrived; Marsh was looking at Love through the open rear passenger door. Love testified that, as he "t[ook] off out of [his] driveway," he heard a "pop." When the State asked him if he knew what "that loud bang was," Love responded, "A gun firing." On cross-examination, Love clarified that he was looking over his shoulder as he drove off. Love turned left out of his driveway. Marsh then returned to his truck and it headed in the opposite direction, at which point Love turned around and began following him. Love called law enforcement, and the dispatcher instructed him to "do nothing." At one point, Marsh's vehicle stopped and Marsh exited and pointed the gun at Love. Love ducked down and Marsh returned to his truck and left. The dispatcher instructed Love to stop following Marsh and go back to his house.

When Love returned home, he awaited law enforcement. When they arrived, he showed them a shell casing that was located in the driveway where Marsh was standing when Love drove away. When asked if he knew where the bullet went, Love stated that it went "[i]n the passenger's seat." The district court received into evidence photos of the interior of Love's vehicle, depicting the back of the front passenger seat of the vehicle with a small black hole, which Love testified was "[t]he bullet hole." Love said there was no exit hole on the other side of the passenger seat.

According to Love, parts of the incident were captured on his "Ring cameras." He explained that one camera was located at his front door, and the other at his side door. Love described the first recording, stating that the front door camera captured Love opening the front door, walking out of his house, and loading a case of water in his rear passenger seat. The clip was 24 seconds long. The second recording was from the side door camera, which depicted a sound that Love described as "the gunshot." The clip was 20 seconds long. The third recording was from the front door camera and showed Love's vehicle driving away from his house. The video further depicted Marsh looking on the ground in the driveway where Love's vehicle had been parked, and then walking to his truck where he entered the front passenger seat. While walking, Marsh can be heard saying something, but it is unclear from the video recording what he said. However, Love indicated that he knew what Marsh said because the video was of better quality when watched on his phone. He claimed that Marsh said, "'I was going to come over here and shoot me a nigga.'" When presented still photographs taken from the videos, Love identified Marsh walking back to his truck in exhibits 20 and 21. When asked if he saw a gun in exhibit 21, Love responded, "In [Marsh's] right hand."

Love further explained that the cameras are "linked," such that "one will start recording, and then the second . . . clicks in." When one of the cameras detects motion, it turns on and records

- 3 -

for a certain amount of time, stops to process the recording for about a minute, and then begins recording again when additional movement is detected. Love stated that the two cameras are "a little offset," meaning there is a "10 to 15 second" delay between the two cameras turning on. He acknowledged that the front door video showed that he had already driven off past a yellow vehicle when the time stamp reflected that it was 8:49:56, while the side door video with the sound Love identified as the gunshot can be heard at 8:50:05. Love explained that it took him at least 10 seconds to leave the driveway from the time Marsh fired the gunshot into the vehicle.

### (b) Law Enforcement Testimony

A law enforcement officer with the Omaha Police Department testified that he responded to the call for service for the March 6, 2022, incident. The officer was not aware whether the "ShotSpotter," an automated system meant to detect gunshots in the area of town Love lived in, was activated when the incident took place. According to the officer, rather than having the crime lab collect the home's video recordings, Love directly emailed them to him. The officer collected a .25 caliber shell casing from the middle of Love's driveway after Love pointed it out to him. Love also pointed out the hole in the back of the passenger seat of his vehicle, which, according to the officer, was consistent with the type of defect that a .25 caliber bullet would produce. However, the officer did not locate the actual bullet while at the scene of the incident. Another law enforcement officer testified that in certain cases, such as a homicide, the crime lab would retrieve a projectile embedded in a vehicle. He stated that in such cases, "they would go in there and rip the seat apart to get the projectile," which would not likely produce fingerprints, but the projectile could possibly be matched to a firearm. There was no attempt to retrieve the projectile from Love's vehicle; in this case, the identity of the shooter was provided by Love and no ballistic testing was warranted since no firearm was found.

A sergeant with the Omaha Police Department testified that 3 weeks after the incident, law enforcement searched Marsh's truck and his residence, but did not find a .25 caliber pistol, ammunition, or casings. When asked whether he was surprised they did not find the firearm, he responded, that he "expected [they] would find a firearm."

### (c) Verdict and Sentencing

The jury found Marsh guilty of attempted first degree assault and use of a deadly weapon to commit a felony. The district court accepted the verdicts of guilty on each count and ordered the preparation of a presentence investigation report (PSR). The court informed Marsh that the report would "contain a great deal of information about [him] that w[ould] assist the Court in determining an appropriate sentence" and that the investigation would be his opportunity to provide the court information regarding his background prior to his sentencing. Following a sentencing hearing, the court entered an order on June 12, 2023, sentencing Marsh to 5 to 15 years' imprisonment on each count, to be served consecutively, with 52 days' credit for time already served.

### III. ASSIGNMENTS OF ERROR

Marsh assigns that (1) there was insufficient evidence to support his convictions and (2) the district court abused its discretion in imposing an excessive sentence.

He also assigns the following claims of ineffective assistance of trial counsel: (a) failing to object to the form of a question regarding Love's testimony about Marsh looking at him, the sound Love heard, and Marsh firing at Love; (b) failing to object to questioning regarding where the bullet went and other details, Love's testimony when the videos were played, and Love's testimony about photos of the hole; and (c) failing to move for a mistrial and object to prosecutorial misconduct during closing argument, obtain the unedited surveillance video from Ring, and track down Love's vehicle to have it inspected.

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Marsh argues that the evidence was insufficient to support his convictions. Marsh was convicted of attempted first degree assault pursuant to §§ 28-308 and 28-201 and use of a deadly weapon to commit a felony pursuant to § 28-1205.

Regarding criminal attempt, § 28-201 provides, in relevant part, that:

(1) A person shall be guilty of an attempt to commit a crime if he or she:

. . . .

(b) Intentionally engages in conduct which, under the circumstances as he or she believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his or her commission of the crime.

Under § 28-308, a person commits the offense of first degree assault when they intentionally or knowingly cause serious bodily injury to another person. First degree assault is a Class II felony. See § 28-308(2). Criminal attempt is a class IIA felony when the crime attempted is a Class II felony. See § 28-201(4)(b). Therefore, the question is whether a rational fact finder could have determined beyond a reasonable doubt that Marsh's conduct constituted a substantial step in a course of conduct intended to intentionally or knowingly cause serious bodily injury to Love.

Use of a deadly weapon to commit a felony provides in relevant part that "[a]ny person who uses a firearm . . . or any other deadly weapon to commit any felony . . . commits the offense of use of a deadly weapon to commit a felony." § 28-1205. Thus, with respect to this offense, if the evidence is sufficient to support Marsh's conviction of attempted first degree assault, a Class IIA felony, the only remaining question is whether a rational fact finder could have determined beyond a reasonable doubt that Marsh used a firearm when committing that offense.

Viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support Marsh's convictions. Love testified that Marsh threatened to come to Love's house to fight him. On the morning of March 6, 2022, Marsh arrived at Love's house, exited his truck, and pulled a .25 caliber pistol from his pocket. When Love entered his own vehicle, Marsh pointed the pistol at Love through the windshield of the vehicle. When Love revved his engine, Marsh went to the passenger side of the vehicle where there was an open rear passenger door. As Love began driving away, Marsh fired the gun in Love's direction through the open door, striking the back of the front passenger seat. Once Marsh drove off, Love followed him. Marsh exited his truck and again pointed the gun at Love. A .25 caliber shell casing was found on Love's driveway, and photographs showed a bullet hole in the back Love's passenger seat, which, according to law enforcement, was consistent with the defect a .25 caliber pistol would produce. A sound can be heard in the side door video recording that Love claimed was the sound of the gunshot. Taken together, and when viewed in the light most favorable to the prosecution, this evidence is sufficient such that a rational fact finder could have determined that Marsh took a substantial step to intentionally or knowingly cause serious bodily injury to Love and that he used a firearm in doing so.

Marsh argues that the video recordings, shell casing, and the defect in the vehicle did not "prove" Love's allegations. Brief for appellant at 18. He points out that only short segments of the video camera recordings were provided to law enforcement and received into evidence, none of which actually show "Marsh pointing and firing a gun toward Love." *Id.* He further notes that there were inconsistencies between the timestamps and events depicted in the front and side door camera recordings. He also points out that the shell casing and the bullet hole in the passenger seat were brought to law enforcement's attention by Love, that the shell casing was never tied exclusively to Marsh, and that the hole in the passenger seat was never examined.

Notably, these issues all involve the credibility and weight of the evidence. It is not the role of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, as such matters are for the finder of fact. *State v. Figures, supra*. We therefore find the evidence was sufficient to support Marsh's convictions of attempted first degree assault and use of a deadly weapon to commit a felony.

2. EXCESSIVE SENTENCE

Marsh assigns that the district court abused its discretion in imposing an excessive sentence for his conviction, and his argument refers only to "count one" (attempted first degree assault) being excessive. Brief for appellant at 22. He makes no argument related to the second count, use of a deadly weapon to commit a felony. This is likely because when the deadly weapon used is a firearm, the offense is a Class IC felony, which is punishable by a mandatory minimum of 5 years' imprisonment and up to 50 years' imprisonment. See § 28-1205(1)(c) and Neb. Rev. Stat. § 28-105

- 6 -

(Cum. Supp. 2022). Also, any sentence imposed for this conviction must be consecutive to any other sentence imposed. See § 28-1205(4). Marsh was sentenced to a consecutive term of 5 to 15 years' imprisonment on the second count, so his minimum term and the consecutive nature of the sentence were both mandated by law, thus making it futile to argue the sentence on this count was excessive.

Regarding Marsh's sentence for his conviction of attempted first degree assault, as previously discussed, it is a Class IIA felony. A Class IIA felony is punishable by up to 20 years' imprisonment. See § 28-105. The court sentenced Marsh to 5 to 15 years' imprisonment, which was within the statutory range. As such, we review the court's sentencing determination only for an abuse of discretion.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Lierman, supra*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Marsh was 51 years old at the time of sentencing. According to the PSR, he never married but lived with his fiance and their child. Marsh also had eight children from prior relationships. He graduated from high school and was employed as a "Shipper/Receiver" at a distribution center from December 2018 until May 2023, when he voluntarily resigned while in good standing with the company.

Marsh's criminal history dating back to 1991 includes numerous assault-related convictions, several convictions for disorderly conduct, a few convictions for destruction of property, a couple convictions for violating a domestic abuse protection order, a conviction for trespassing, and more. The probation officer noted that Lisa was the victim of several of Marsh's convictions. Marsh's last criminal conviction prior to the present offenses was in 2013. Marsh also had convictions for multiple traffic offenses. The probation officer conducted a "Level of Service/Case Management Inventory" which assessed Marsh as a high risk to reoffend.

The PSR included a "Victim Impact Questionnaire" wherein Love stated that Marsh's actions caused him concern over his safety and resulted in his daughter not bringing his grandson to his house for a period of time. He further stated that it caused his 13-year-old son to be "worried about being home." He urged the district court to impose consecutive sentences of the maximum possible penalty for each conviction.

The PSR included numerous letters from Marsh's loved ones urging the district court to minimize Marsh's sentence for the sake of his fiancé and 12-year-old daughter. Marsh's fiance wrote that her "life ha[d] been turned upside down" since Marsh's incarceration and that their daughter "d[idn't] know how to deal with th[e] situation." She stated that they were in the process of purchasing a new home "so that [they] could build a good life & future for [their] daughter." The authors of the letters described Marsh as caring and selfless, as well as a "hardworking family man."

At the sentencing hearing, Marsh's trial counsel highlighted to the district court that Marsh had no prior felony convictions and "no appreciable offenses in the last ten years." Trial counsel

asserted that Marsh did "not have a significant history of violence" and "no history of gun violence." Marsh was a "stable member of society," had consistent employment, a house, and a partner with whom he was raising a child. Trial counsel further noted that Marsh maintained his innocence but stated that this did not mean he could not self-reflect as far as what his . . . action[s] [we]re." Marsh "showed some insight in the sense that when he was asked about some of his shortcomings . . . he did indicate he has a tendency to get too angry when people are messing with his family." Trial counsel further noted that the probation officer who conducted Marsh's presentence investigation "indicated that he was calm and . . . respectful throughout the interview." Trial counsel urged the court to impose a "more minimal sentence."

The State disagreed with trial counsel's remark that Marsh did not have a significant history of violence, noting that Marsh had "a severe anger issue when it comes to Lisa Roum and anyone that Lisa is associated with." The State noted that Marsh had a pattern of victimizing Lisa and suggested that this was a "dynamic that played a large role in bringing [about] the events of this case." The State further noted that Marsh's intent was likely more than to merely damage Love's vehicle and that Marsh was "very lucky not to be here on a murder charge."

The district court stated that it had reviewed the PSR and considered the relevant sentencing factors in determining an appropriate sentence to impose. The court stated that it reviewed the "letters of support for [Marsh], all of which were very positive and portray [him] in a very positive light." The court also specifically noted that Marsh had no prior felony convictions but did have convictions for "crimes of violence" and was assessed as a high risk to reoffend. The court also recited the circumstances of the offense, noting that even if Marsh had simply been trying to scare Love, "people still die in situations like this." The court then sentenced Marsh as previously set forth.

In his brief on appeal, Marsh argues that he had maintained a "law-abiding life for a significant period of time leading up to the incident" and provided significant character evidence to the district court from "people that knew him best." Brief for appellant at 19. He further argues that the evidence showed he merely "attempt[ed] to scare rather than injur[e]" Love. *Id.*

Upon our review of the relevant sentencing factors in this case, we cannot say that the district court abused its discretion. The court appropriately considered the seriousness of Marsh's offense and his individual circumstances. Because the appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life, a sentencing court is accorded very wide discretion in imposing a sentence. See *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017). To the extent Marsh argues that the court did not adequately consider certain mitigating factors, we note that it is evident the court had before it all the information Marsh suggests should have resulted in a lesser sentence. However, it was within the sentencing court's discretion to weigh more heavily the factors supporting a lengthier sentence, such as the seriousness of the offense and Marsh's history of assault-related convictions. We therefore cannot say the court abused its discretion in determining the sentence imposed.

### 3. INEFFECTIVE ASSISTANCE OF COUNSEL

Marsh is represented by different counsel on direct appeal than he was at trial. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must

raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

To prevail on a claim of ineffective assistance of counsel, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020). When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide deficient performance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Anderson, supra*. The record on direct appeal is sufficient to review a claim of ineffective assistance of trial counsel if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id*.

To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id*. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*.

With these governing principles in mind, we turn now to Marsh's ineffective assistance of trial counsel claims.

(a) Failure to Object to Form of Question

*(i) Regarding Marsh Looking at Love When Firing*

Marsh claims he received ineffective assistance when trial counsel "failed to object to the form of the question regarding Love's testimony as to Marsh looking at him." Brief for appellant at 22. He specifically refers to the State asking Love the following question: "He goes to the actual passenger's side door, but because you take off, he's looking at you through the open back passenger's side?" *Id.* at 23. Love responded, "Yes." *Id.* Marsh argues that trial counsel should have objected to the question because it was "leading." *Id.* He argues that he was prejudiced because "Love's adoption of the question as evidence helped prove the case to connect the hole with the firing of the gun." *Id.*

Regardless of whether trial counsel may have been deficient in this regard, we find that Marsh cannot show that he was prejudiced because, as the State points out in its brief on appeal, even if trial counsel had objected and the objection had been sustained, the State could have simply rephrased the question to elicit the same information. Love had already testified that, when he revved his engine, Marsh went to the passenger side of his vehicle. He stated that the rear passenger door was still open and he heard the "pop" while he was "tak[ing] off out of [the] driveway." The State's questioning simply referenced Love's prior testimony.

Marsh further argues that trial counsel should have objected to the question based on lack of foundation since Love "could not testify to where Marsh was looking at the moment." Brief for

appellant at 23. Had trial counsel objected on the basis of foundation, the State could have laid additional foundation by asking Love where he was looking when he was driving away. In fact, Love later testified on cross-examination that he was looking over his shoulder in Marsh's direction as Marsh fired the pistol. Regardless of any alleged deficiency, Marsh would not be able to establish prejudice on this claim, and it therefore fails.

### (ii) Regarding Sound of Gunshot

Marsh argues that he received ineffective assistance when his trial counsel "did not object to the State converting Love's description of a 'pop' to a 'loud bang.'" Brief for appellant at 23. He argues that the State "mischaracterized the evidence" to "try and prove that Marsh had fired a firearm." *Id.* at 23-24. He argues that the State attempted to use Love's testimony to "match up the sound heard on a surveillance video to help establish Marsh had fired," since "the investigation failed to turn up a bullet." *Id.* at 24. He argues he was prejudiced by trial counsel's failure to object to the State's "misstatement of the evidence" which allowed the State to "prove their case." *Id.* However, we fail to see how Marsh could establish prejudice by the State's characterization of the sound Love testified he heard given that he explicitly testified that he recognized the sound as gunfire. Further, the jury could draw its own conclusions regarding the characterization of the sound heard on the video evidence. This claim of ineffective assistance of counsel fails.

### (iii) Regarding Marsh Firing Gun

Marsh claims trial counsel was ineffective by failing to object when the State asked Love if Marsh "fired though the open back passenger door." Brief for appellant at 24. Marsh again argues that the State's question was leading and that it lacked foundation since "Love did not have the knowledge to be able to answer this." *Id.* However, as we previously determined, had trial counsel objected and the district court sustained the objection, the State could have rephrased the question and laid additional foundation regarding where Love was looking when leaving the driveway. Love testified that he was looking over his shoulder in Marsh's direction as Marsh fired the pistol. This claim of ineffective assistance of counsel also fails.

### (b) Failure to Object to Questioning

### (i) Regarding Where the Bullet Went

Marsh claims trial counsel was ineffective by failing to object when Love testified that the bullet ended up in the passenger seat, as well as some added testimony which was not responsive to the State's question. He specifically refers to the following line of questioning:

Q [by the State]. Do you ever find out where the bullet went?
A [by Love]. Yes.
Q. And where is that?
A. In the passenger's seat, which I was having my son -- I have my 13-year-old son. He goes to his mom's on the weekend. And usually he's in that passenger's seat. And it was in the back of the passenger's seat, like the shoulder corner of the passenger's seat. Had it been a little bit higher, it would have went between the seat and the headrest.

We note that while Love's testimony could have been construed to mean that the bullet was actually recovered from the front passenger seat, it was made clear throughout trial that Love based his belief about the location of the bullet on the fact that there was a hole in the back of the front passenger seat and no exit hole in the front of the seat. It was also made clear by law enforcement testimony that the actual bullet was never extracted from the inside of the seat. Further, although Love's testimony regarding his 13-year-old child usually sitting in the front passenger seat was not relevant to the issues at trial, there was no testimony that his child was actually in the passenger's seat. We fail to see how Marsh could establish prejudice by this testimony, even assuming trial counsel was deficient for failing to object. This claim of ineffective assistance of counsel fails.

*(ii) Regarding Video Recordings*

Marsh claims that he received ineffective assistance when his trial counsel "failed to object to . . . Love's testimony when the videos were played." Brief for appellant at 26. He specifically takes issue with Love's testimony that Marsh can be seen in the video searching for a shell casing in one of the videos. He argues that trial counsel should have objected on the basis of speculation, in addition to "best evidence." *Id.* He further argues that trial counsel should have objected when the State asked Love what Marsh says in the video. *Id.* Love testified that Marsh said, "'I was going to come over here and shoot me a nigga.'" Marsh argues that "the State got into evidence that [he] essentially confessed to the crimes." *Id.* at 27.

Even if trial counsel was deficient for failing to object along these lines, Marsh would not be able to establish prejudice. He would not be able to demonstrate a reasonable probability that but for said deficient performance, the result of the proceeding would have been different. As noted by the State, the jury was able to see and hear the video evidence and reach its own conclusions regarding what can be observed or heard. Further, the video at issue captures Marsh after Love had already driven away. Therefore, what Marsh was doing in the video and what he may or may not have said at that time does not bolster nor diminish Love's testimony about how the events unfolded before Love had driven away. This claim of ineffective assistance of trial counsel fails.

*(iii) Regarding Photographs of the Hole*

Marsh claims he received ineffective assistance when trial counsel "failed to object to the questioning of Love concerning the photos of the hole." Brief for appellant at 27. The State showed Love two photographs of the hole in the back of the front passenger seat of his vehicle. Marsh takes issue with the following line of questioning:

Q [by the State]. I'm showing you Exhibit 13, which is a more zoomed-in version of the previous exhibit?

A [by Love]. Yes.

Q. Can you see the bullet hole in that exhibit?

A. Yes.

. . . .

Q. I'm going to show you the . . . closer version. This is Exhibit 12. Is that the bullet hole that you found?

A. Yes.

Marsh argues that the State asked leading questions that were lacking in foundation by referring to the hole in his passenger seat as "the bullet hole." *Id*. at 27. However, Love had previously testified that the bullet went into "the back of the passenger's seat." He had also already described the hole in the back of his passenger seat as a "bullet hole." When asked by the State if he could describe "what Exhibit No. 11 is," he responded, "[t]he bullet hole." Similarly, when asked to describe Exhibit 12, he stated that it was "[a]nother picture of the bullet hole." Any foundation objection would have likely been overruled by the district court or would have otherwise prompted further questioning to get to the same evidence. We therefore find that trial counsel was not deficient for failing to object to these specific questions on the basis of foundation. See *State v. Devers*, 313 Neb. 866, 986 N.W.2d 747 (2023) (counsel cannot be ineffective for failing to raise meritless argument). This claim of ineffective assistance of trial counsel fails.

(c) Failure to Object During State's Closing Argument

During closing argument, the State argued that Marsh shot at Love and disposed of the firearm at some point in the weeks following the incident. The State asked the jury, "Does it surprise you that not one gun was found on him three weeks later? It doesn't shock me. How hard is it when he's driving away to throw it out the window? He had three weeks to do that." The State also asserted that Marsh can be heard in the third video saying, "I told you I'd shoot you for putting your hand on my son."

Marsh claims that he received ineffective assistance when trial counsel "failed to move for a mistrial and object to prosecutorial misconduct during closing argument." Brief for appellant at 28. He argues that the State "made two arguments in closing that were objectionable." *Id.* Marsh takes issue with State arguing in closing "that it did not shock [the State] that no gun was found three weeks" after the March 6, 2022, incident. *Id.* Marsh also takes issue with the State's description of what Marsh said in the third video. He argues that those remarks by the State "misstated the evidence and included the prosecutor's opinion." *Id.* at 28.

To determine whether the State engaged in prosecutorial misconduct based on statements made during closing arguments, a reviewing court first determines whether the prosecutor's remarks were improper. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020). Then, if necessary, it determines the extent to which the improper remarks had prejudicial effect on the defendant's right to a fair trial. *Id*. Prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct could undermine a defendant's right to a fair trial. *Id*. Prosecutors have a duty to conduct fair and impartial criminal trials and to not inflame the prejudices or excite the passions of the jury against the accused. See *id*. A prosecutor's conduct will not amount to misconduct if it does not mislead and unduly influence the jury. See *id*. A prosecutor cannot express his or her personal belief or opinion as truth or falsity of any testimony, evidence, or guilt. See *id*. However, a prosecutor is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence if those comments rest on reasonably drawn inferences. See *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016).

The State's statement "that it did not shock [the State] that no gun was found three weeks" after the incident did not amount to prosecutorial misconduct. The statement was not misleading, and it rested on reasonably drawn inferences. There was testimony by law enforcement that several

weeks had elapsed between the incident and the search due to various factors. It is a reasonable inference that the more time that elapses following a shooting incident, the more likely the firearm may not be found. We therefore find that trial counsel was not deficient for failing to object to this statement. See *State v. Devers, supra* (counsel cannot be ineffective for failing to raise meritless argument).

Regarding the State's comment that Marsh could be heard in one of the video recordings saying, "I told you I'd shoot you for putting your hand on my son," we conclude that even if trial counsel was deficient for not objecting to this paraphrasing of the evidence, Marsh would not be able to establish prejudice. Love testified about the incident involving Marsh's son Malec taking a swing at Love, resulting in Love holding Malec down on the ground until he calmed down. Love also described the repeated phone calls from Malec and Marsh, with Marsh threatening to "come fight [Love]." Notably, the State's paraphrasing in closing was less inflammatory than Love's testimony where he claimed Marsh said, "'I was going to come over here and shoot me a nigga.'" We conclude that Marsh would not be able to demonstrate a reasonable probability that but for counsel's statement, the result of the proceeding would have been different. This claim of ineffective assistance of trial counsel fails.

### (d) Failure to Obtain Unedited Video Recordings

Marsh claims that he received ineffective assistance when trial counsel failed to obtain the unedited versions of the video recordings. He argues that "[w]ithout the actual video, the jury was left to rely on Love's interpretation and version." Brief for appellant at 29. He contends that had trial counsel obtained the full video, it would have showed that no shooting took place.

The record on direct appeal reflects that only portions of the video recordings were received into evidence. Love testified that the cameras record for approximately 1 minute, stop recording for a period to process the video, and start recording again; none of the video recordings were a minute long. Thus, only portions of the video recordings were received into evidence. However, the record does not show whether trial counsel attempted to obtain or actually obtained the full video recordings, nor can we know trial counsel's strategy with regard to the videos. We therefore find that the record is not sufficient to address this claim of ineffective assistance of trial counsel on direct appeal.

### (e) Failure to Inspect Love's Vehicle

Marsh claims that he received ineffective assistance when his trial counsel "failed to track down Love's vehicle to have it inspected." Brief for appellant at 30. He claims that had trial counsel done so, "it would have resulted in discovery that no bullet was located in the seat." *Id.* He argues that this information would have been helpful to his defense that he did not fire a weapon. The record does not show whether defense counsel attempted to access the vehicle, nor what his trial strategy was related to further discovery about the hole in the passenger seat. We therefore find that the record is not sufficient to address this claim of ineffective assistance of trial counsel on direct appeal.

## VI. CONCLUSION

For the reasons set forth above, we affirm Marsh's convictions and sentences. And although the record before this court is insufficient to address Marsh's last two claims of ineffective assistance of trial counsel related to obtaining the unedited video and failing to inspect Love's vehicle for the bullet, we otherwise conclude that Love's other claims of ineffective assistance of trial counsel fail.

AFFIRMED.